**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

U.S. CARD PARTNER SERVICES, INC.,   :
                                    :
             Plaintiff,             :
                                    :
        v.                          :   C.A. No.: 06-283 JJF
                                    :
DREW SCOPELLITI,                    :   JURY TRIAL DEMANDED
                                    :
             Defendant.             :

**OPENING BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR**
**LACK OF IN PERSONAM JURISDICTION AND/OR ON THE GROUNDS OF FORUM**
**NON CONVENIENS; OR, IN THE ALTERNATIVE, FOR A CHANGE OF VENUE**

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

Of Counsel:
Peter M. Katsaros, Esq.
Hughes Socol Piers Resnick & Dym, Ltd.
Three First National Plaza
70 West Madison Street, Suite 4000
Chicago, Illinois 60602-4205
(312)580-0100

July 12, 2006

### TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.      THIS COURT LACKS IN PERSONAM JURISDICTION OVER DEFENDANT. . . . . . 7

        A.      There is no statutory basis to establish jurisdiction under the Delaware long-arm
                statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      An exercise of jurisdiction would violate Defendant's constitutional right to due
                process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.     DELAWARE IS A FORUM NON CONVENIENS. . . . . . . . . . . . . . . . . . . . . . . 11

III.    IF NOT DISMISSED, THIS COURT SHOULD GRANT A CHANGE OF VENUE. . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Affidavit of Drew Scopelliti . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attached

Unreported Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attached

i

## **TABLE OF AUTHORITIES**

<u>Bell Helicopter Textron, Inc. V. C&C Helicopter Sales, Inc.</u>, 295 F. Supp. 2d 400
(D. Del. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 12

<u>Beverly Hills Fan Co. v. Royal Sovereign Corp.</u>, 21 F.3d 1558 (Fed Cir. 1994). . . . . . . . . . . . . 9

<u>Brown v. The Buschman Company</u>, 2002 U.S. Dist. LEXIS 4087 (D. Del. 2002). . . . . . . . . . . 13

<u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Candlewood Timber Group, LLC v. Pan Am. Energy LLC</u>, 2003 Del. Ch. LEXIS 118 (Del. Ch.
2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

<u>ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.</u>, 147 F. Supp. 2d 268
(D. Del. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945). . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Jumara v. State Farm Ins. Co.</u>, 55 F.3d 87 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Joint Stock Soc'y v. Heublein, Inc.</u>, 936 F. Supp. 177 (D. Del. 1996). . . . . . . . . . . . . . . . . . . . 7

<u>Liggett Group, Inc. v. Affiliated FM Insurance Company</u>, 788 A.2d 134 (Del. Super. 2001). . . 13

<u>M&M Technologies, Inc. v. Gurtler Chemicals, Inc.</u>, 2005 U.S. Dist. LEXIS 1726 (D. Del.
2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

<u>Patterson v. FBI</u>, 893 F.2d 595 (3d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Sandvik v. Advent International Corp.</u>, 83 F. Supp. 2d 442 (D. Del. 1999). . . . . . . . . . . . . . . 15

<u>Van Dusen v. Barrack</u>, 376 U.S. 612, 616 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286 (1980). . . . . . . . . . . . . . . . . . . . . 9

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff filed its Complaint in the Superior Court of the State of Delaware in and for New Castle County on February 28, 2006.  Plaintiff alleges four separate counts against Defendant: "Material Misrepresentation, Material Breach of Contract, Legal Rescission, and Declaratory Judgment Based On Defendant's False Representations And Failure To Faithfully And Competently Perform And/Or The Language Of The Employment Agreement."  The gravamen of Plaintiff's Complaint is the allegation that Defendant "lacked the skills and the intent to competently and faithfully perform [his duties of Sales Director].  (Complaint ¶ 7).

Plaintiff is a citizen of the State of Delaware.  (Complaint ¶ 1). Defendant is a citizen of the State of Illinois.  (Affidavit ¶ 1). The Delaware Secretary of State was served on March 20, 2006 for Defendant pursuant to the Delaware Long-Arm Statute.  Defendant received notice of service on April 13, 2006.  An Answer to the Complaint in the state court was not filed.

On May 1, 2006, Defendant removed the case from the Superior Court of the State of Delaware to this Court.  (D.I. 1).

On July 12, 2006, Defendant filed his Motion to Dismiss for Lack of In Personam Jurisdiction and/or on the Grounds of Forum Non Conveniens; or, in the Alternative, for a Change of Venue.  This is Defendant's Opening Brief in support of his motion.

1

## SUMMARY OF ARGUMENT

1.    There is no statutory basis for finding jurisdiction over Defendant under the Delaware long-arm statute.

2.    The exercise of jurisdiction over Defendant violates the Due Process Clause of the United States Constitution.

3.    Delaware is a <u>forum</u> <u>non</u> <u>conveniens</u>.

2

## STATEMENT OF FACTS

Mr. Scopelliti is a resident and citizen of Illinois. His address is 4250 N. Marine Drive Apartment 1102, Chicago, Illinois. He has have lived at that address for approximately 3 years. (Affidavit ¶ 1).

Prior to his employment with U.S. Card Partner Services, Inc. (USCPS), which began in December 2004, Mr. Scopelliti worked for Kessler Financial Services (KFS) representing MBNA to the University market for 5 years. He worked from his home in Chicago since his territory was Coast to Coast and Chicago facilitated his coverage of the country. He was responsible for securing the endorsements of major U.S. Universities for MBNA to allow them to market logoed credit cards to their respective alumni. The process involved developing the appropriate contact at the school and convincing them to entertain an offer from MBNA which then competed with other Banks. The university would make a selection of a bank to conduct its offering to alumni based primarily on the financial offer, but also soft benefits. (Affidavit ¶ 2).

Mr. Scopelliti was recruited by USCPS while employed at KFS. (Affidavit ¶ 3).

The initial overture in recruitment was made by Stan Cochran of Baltimore, Maryland at a CASE Conference in San Diego, California on Sunday, July 11, 2004. (Affidavit ¶ 4).

On July 16, 2004, Mr. Scopelliti received in Chicago a pre-employment Agreement for Use and Non-Disclosure of Proprietary Information with USCPS, which he executed and returned. (Affidavit ¶ 5).

In August 2004, Mr. Scopelliti met with Stan Cochran (USCPS) of Baltimore, Maryland and Joseph Janz (US Bank) of St. Paul, Minnesota at Gibson's restaurant in Chicago. The subject matter of the discussion was the range of Mr. Scopelliti's contacts in higher education,

US Bank's interest in major University endorsements, their 5 star guarantee and ability to share greater revenue with the endorsing school owing to a superior efficiency ratio.  (Affidavit ¶ 6).

On August 27, 2004, Mr. Scopelliti received an email with an initial offer from USCPS with "full support of our partners at US Bank", from Stan Cochran to his significant other at Northwestern University in Evanston, Illinois.  (Affidavit ¶ 7).

On September 17, 2004, Mr. Scopelliti met with Tom O'Neill at Midway airport in Chicago.  They discussed US Bank's appetite for universities and the prospect of offering other US Bank products to the university industry.  (Affidavit ¶ 8).

In September 2004, Mr. Scopelliti met with Stan Cochran (USCPS) of Baltimore, Maryland, Joe Janz (US Bank) of St. Paul, Minnesota, and James Geeslin (US Bank) of Atlanta, Georgia at McCormick and Schmidts restaurant in Chicago, Illinois.  They discussed US Bank's enthusiasm for major universities and the many other kinds of Bank products they could market to that sector.  (Affidavit ¶ 9).

On September 22, 2004, Tom O'Neil faxed a "Sales Director's earnings" spreadsheet from New York, New York to Mr. Scopelliti at his home in Chicago, Illinois.  (Affidavit ¶ 10).

On October 7, 2004, Mr. Scopelliti stopped by to see Newark, Delaware office of USCPS.  He was secretly ushered into the conference room and met only with Stan Cochran for about 10 minutes.  They discussed no business; instead, they discussed the conference table Mr. Cochran purchased at a discount that was slightly damaged.  (Affidavit ¶ 11).

On November 15, 2004, Mr. Scopelliti received a revised offer letter via fax to his home in Chicago. [Exhibit A].  (Affidavit ¶ 12).

During November 15-19, 2004, Mr. Scopelliti had phone conversations with Tom O'Neil

(USCPS) in New York, New York and Stan Cochran (USCPS) in Baltimore, Maryland, which resulted in a final version of the letter of agreement. At all times, Mr. Scopelliti was in Chicago, Illinois. (Affidavit ¶ 13).

On November 15, 2004, Mr. Scopelliti received the employment agreement, confidentiality agreement, which has a choice of law and forum selection clause of Minnesota [Exhibit B], employee's acknowledgement of pre-existing obligations [Exhibit C] and a Code of Ethics [Exhibit D]. On November 19, 2004, Mr. Scopellitit signed the documents and faxed them from Chicago, Illinois to Stan Cochran (USCPS) in Baltimore, Maryland. (Affidavit ¶ 14).

Mr. Scopelliti began working for USCPS on December 6th from his home in Chicago, Illinois, and held the position of Director, Education Sector. Tom O'Neil (USCPS) relocated his residence from White Plains, New York to Barrington, Illinois. Initially, he worked from his home in Illinois and served as Mr. Scopelliti's immediate supervisor. (Affidavit ¶ 15).

Mr. Scopelliti immediately began securing an audience for US Bank. He hosted a reception in his Chicago home in December of 2004 with the chief executives from Nebraska, Florida State University, Georgia Tech, Florida State, Arizona, Houston, Purdue, UConn, Illinois and executives of US Bank and USCPS. (Affidavit ¶ 16).

From December 2004 through March 2005, Mr. Scopelliti's work was conducted from his home office at 4250 N. Marine Dr. #1102, Chicago, Illinois. In May 2005 Tom O'Neil established the "Chicago office" of USCPS, which was a sublet of a studio apartment at 300 East Randolph, Chicago, Illinois. (Affidavit ¶ 17).

While an employee of USCPS, the only time that Mr. Scopelliti was in Delaware for business was one sales meeting on January 28, 2005. He was never in, nor did he have contact

5

with, Delaware for any other USCPS business.  (Affidavit ¶ 18).

Mr. Scopelliti was terminated at the Chicago Office on July 26, 2005.  (Affidavit ¶ 19).

During his employment with USCPS,

A.  He did not perform any character of work or service in Delaware;

B.  He did not contract to supply services or things in Delaware;

C.  He did not cause any tortious injury by an act or omission in Delaware;

D.  He did not cause tortious injury in Delaware or outside of Delaware by any act or omission outside of Delaware and he did not solicit business, engage in any persistent course of conduct in Delaware or derive revenue from any services or things in Delaware;

E.  He did not have an interest in, use or possess any real property in Delaware; and

F.  He never contracted to insure or act as surety in any capacity within Delaware. (Affidavit ¶ 20).

While employed by USCPS, Mr. Scopelliti's wages came from U.S. Card Partner Services, Inc., 22 Harvard Ct., White Plains, New York.  He never had to pay, nor did he ever have deducted, any Delaware state tax on his wages.  (Affidavit ¶ 21).

## ARGUMENT

**I.    THIS COURT LACKS IN PERSONAM JURISDICTION OVER DEFENDANT.**

The Court must dismiss a complaint for lack of in personam jurisdiction of a non-resident unless (1) there is a statutory basis for finding jurisdiction under the Delaware long-arm statute, 10 Del. C. § 3104; and (2) the exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.  See Bell Helicopter Textron, Inc. V. C&C Helicopter Sales, Inc., 295 F. Supp. 2d 400, 402-403 (D. Del. 2002).

The plaintiff bears the burden of alleging facts sufficient to make a prima facie showing of personal jurisdiction.  See ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc., 147 F. Supp. 2d 268, 270-71 (D. Del. 2001).  "To satisfy the burden, the plaintiff must adduce facts which 'establish with reasonable particularity' that jurisdiction over the defendant exists."  Id. (quoting Joint Stock Soc'y v. Heublein, Inc., 936 F. Supp. 177, 193 (D. Del. 1996)).

**A.    There is no statutory basis to establish jurisdiction under the Delaware long-arm statute.**

The Delaware long-arm statute provides, in pertinent part:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in the section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply services or things in this State;
> (3) Causes tortious injury in the State by an act or omission in this State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

7

(5) Has an interest in, uses or possesses real property in the State;
or
(6) Contracts to insure or act as surety for, or on, any person,
property, risk, contract, obligation or agreement located, executed
or to be performed within the State at the time the contract is made,
unless the parties provide otherwise in writing.  10 Del. C. § 3104.

Plaintiff has failed to allege any facts that would place Defendant within any of the six

enumerated categories of the Delaware long-arm statute.  On the contrary, as verified by

Defendant's affidavit, no jurisdiction exists.  First, Defendant did not transact any business or

perform any character of work or service in Delaware.  (Affidavit ¶ 20).  Second, Defendant has

not contracted to supply services or things in Delaware.  (Affidavit ¶ 20).  Third, Defendant has

not caused any tortious injury by an act or omission in Delaware. (Affidavit ¶ 20).  Fourth,

Defendant has not caused tortious injury in the State or outside of the State by an act or omission

outside the State and he does not regularly do or solicit business, engage in any other persistent

course of conduct in the State or derive substantial revenue from services, or things used or

consumed in the State.  (Affidavit ¶ 20).  Fifth, Defendant does not have an interest in, use or

possess any real property in Delaware.  (Affidavit ¶ 20).  Sixth, Defendant never contracted to

insure or act as surety in any capacity within Delaware.  (Affidavit ¶ 20).

**B.    An exercise of jurisdiction would violate Defendant's constitutional right to
due process.**

The second step in the court's analysis is to determine whether exercising jurisdiction

comports with the requirements of the Due Process Clause of the Fourteenth Amendment of the

United States Constitution.  See M&M Technologies, Inc. v. Gurtler Chemicals, Inc., 2005 U.S.

Dist. LEXIS 1726 (D. Del. 2005).  "The Due Process Clause requires that, in order to subject a

defendant who is 'not present within the territory of the forum' to personal jurisdiction, the court

8

must first make sure that the party 'has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.'" Id. at *15 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, the "minimum contacts" must be purposeful.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).  The non-resident's contact must be of the nature that would cause him to reasonably foresee that he might be "haled before a court" in the forum as a result of his conduct. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  Finally, "even if the requisite minimum contacts have been found ... if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1568 (Fed Cir. 1994).

In this case, Defendant has not engaged in any action in Delaware, except attending one staff meeting on January 28, 2005, and, prior to his employment, once visiting the Plaintiff's Newark office for ten minutes.  (Affidavit ¶ 11 & 18).  Defendant's November 15, 2004 letter agreement, which was signed by him in Chicago, Illinois, specifically stated that Defendant "will be based in Chicago and work from [his] home." [Exhibit A to Affidavit ¶ 1.]  His employment agreement makes no mention of Delaware in a choice of law or forum selection clause. However, the Confidentiality and Intellectual Property Agreement, which accompanied the letter agreement, has a choice of law and forum selection clause of Minnesota. [Exhibit B to Affidavit ¶ 14].  Defendant worked from his Chicago home from December 2004 through March 2005, after which time, USCPS established a Chicago office, where Defendant conducted his work.

(Affidavit ¶ 17).  Defendant's paychecks came from New York, without any Delaware tax on his wages. (Affidavit ¶ 21).

The only allegation by Plaintiff of contact by Defendant with Delaware contained in the Complaint is in paragraph 5, which states "While in New Castle County, Delaware in 2004, Defendant communicated to Plaintiff false representations that he (Defendant) was qualified to competently perform the duties of that Sales Director position; that, if employed in that position, he would faithfully perform its duties; and that, based on his contacts, he would be able to successfully market Card Programs to certain specific institutions that were purportedly ready to implement Card Programs."  Plaintiff's vague assertion[1] of contact by Defendant with Delaware is not sufficient to withstand a Rule 12(b)(2) motion to dismiss.  See Patterson v. FBI, 893 F.2d 595, 603-604 (3d Cir. 1990)(stating "Once the motion is made, plaintiff must respond with actual proofs, not mere allegations.").  As set forth in his Affidavit, Defendant was not present in Delaware in 2004, except, prior to his employment, once visiting the Plaintiff's Newark office for ten minutes, where he discussed no business and only discussed the purchase of a conference table.  (Affidavit ¶ 11 & 18).  Defendant had no business contacts with Delaware.  (Affidavit ¶ 18).

---

[1] Plaintiff violates the particularity requirements of Fed. R. Civ. P. 9(b), through its failure to specify the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.

## II.    DELAWARE IS A FORUM NON CONVENIENS.

Assuming <u>arguendo</u>, that this Court determines that it possesses personal jurisdiction, this Court should still dismiss the case under the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u>. A court should dismiss a case based on the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u> "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience" or when the "chosen forum [is] appropriate because of considerations affecting the court's own administrative and legal problems." <u>See</u> <u>Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc.</u>, 295 F. Supp. 2d 400, 411 (D. Del. 2002) (quoting <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 241 (1981)).

At the outset of any inquiry, the Court must first determine whether there exists an alternative forum, which in this case is Illinois since Defendant is, and, at all relevant times, has been an Illinois resident. <u>See</u> <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 506 (1947). In <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501 (1947), the Court found that this requirement is satisfied when the defendant is "amendable to process" in the other jurisdiction. <u>Id</u>. at 506-507.

Second, the Court must weigh the private interests affecting convenience of the litigants. <u>See</u> <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 506 (1947). Private interest factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make of a case easy, expedious and inexpensive." <u>Id</u>. at 508.

In this case, Defendant and Tom O'Neil, Defendant's immediate supervisor, are residents

11

of Illinois. (Affidavit ¶ 15). Defendant's work was performed from Illinois - initially it was done from his Chicago home and then in the Chicago Office of USCPS. (Affidavit ¶ 17). Therefore, Defendant's day-to-day work and documents relating thereto, are more readily available in Illinois. In addition, Illinois is not an inconvenient location for Plaintiff since it has a Chicago office. (Affidavit ¶ 17).

Finally, the Court must weigh the public interests. Factors of public interest involve administrative difficulties flowing from court congestion; local interest in having localized controversies decided at home; avoidance of unnecessary problems in conflict of laws, or in application of foreign law; unfairness of burdening citizens with jury duty in an unrelated forum; and interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action." Id. at. 509.

In Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc., 295 F. Supp. 2d 400 (D. Del. 2002), this Court found that the public interest factors favored the foreign forum. See id. at 412. In Bell, the plaintiff filed a trademark infringement and related causes of action, against a defendant Canadian corporation and defendant Delaware corporation. Defendants contended that conflicts of law will arise requiring the court to apply foreign law; there will be a burden of jury duty imposed upon people in the community having no relation to the litigation; and that there is a local interest in the resolution of the matters by the Canadian community. See id. at 410. The Court based its holding on the fact that a conflict of law was at issue, which could burden a Delaware jury, and the Court, on attempting to apply Canadian law, and the Court also found that Canada had an interest in the decision, whereas Delaware did not. See id. at 412.

Similarly, in this case, Illinois law should be applied, and neither this Court or a Delaware

jury should be required to apply foreign law. This Court is sitting in diversity and must apply the choice of law rules of Delaware to determine which state's law governs this matter. See <u>Brown v. The Buschman Company</u>, 2002 U.S. Dist. LEXIS 4087, *11 (D. Del. 2002). Delaware has adopted the "most significant relationship test" for determining which state's law to apply. <u>See e.g., Liggett Group, Inc. v. Affiliated FM Insurance Company</u>, 788 A.2d 134 (Del. Super. 2001). In applying the "significant relationship test", Delaware considers the following contacts "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." See <u>Liggett Group, Inc. v. Affiliated FM Insurance Company</u>, 788 A.2d 134 (Del. Super. 2001)(quoting Restatement (Second) of <u>Conflict of Laws</u> § 188.

In this case, with the exception of the Plaintiff's place of incorporation, all the above factors favor the application of Illinois law. See <u>Candlewood Timber Group, LLC v. Pan Am. Energy LLC</u>, 2003 Del. Ch. LEXIS 118 (Del. Ch. 2003)(applying Argentine law to contract claims where place of contracting, negotiation, performance and subject matter of contract were in Argentine), rev'd on other grounds, 859 A.2d 989 (Del. 2004). First, the place of contracting is Illinois, since it is where the last act that occurred which was necessary to give the contract binding effect, which was the Defendant receiving and executing the employment documents. (Affidavit ¶ 14). See <u>Liggett Group, Inc. v. Affiliated FM Insurance Company</u>, 788 A.2d 134, 139 (Del. Super. 2001). Second, the initial negotiations took place in Chicago, Illinois, including Plaintiff's agents meeting Defendant at Gibson's restaurant in Chicago in August 2004, (Affidavit ¶ 6), Midway Airport in Chicago on August 27, 2004 (Affidavit ¶ 8), and McCormick

13

and Schmidts restaurant in Chicago in September 2004 (Affidavit ¶ 9). The final negotiations in November 2004 took place while Defendant was in Chicago, Illinois. (Affidavit ¶ 13). Third, the performance of the employment was to be and, in fact was, conducted from Chicago. The November 15, 2004 employment letter (Exhibit A to Affidavit, ¶ 1) states: "You will be based in Chicago and work from your home until such time as USCPS opens a regional office." Defendant did work from his Chicago home from December 2004 through March 2005, after which time, USCPS established a Chicago office, where Defendant conducted his work. (Affidavit ¶ 17). Further, comment (f) of the Restatement (Second) of <u>Conflict of Laws</u> § 188 notes that when the place of negotiation and place of performance are in the same state, the court should generally apply the law of that state.

14

**III.    IF NOT DISMISSED, THIS COURT SHOULD GRANT A CHANGE OF VENUE.**

28 USC § 1404(a) permits this Court, in its discretion, to transfer this civil action to another district.  The statute states "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The purpose is "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).  Therefore, in addition to the statutory factors, the court should consider all relevant factors to determine whether, on balance, the litigation would more conveniently proceed in and the interests of justice be better served by transfer to a different forum.  See Jumara v. State Farm Ins. Co., 55 F.3d 87 (3d Cir. 1995).  Transferring an action for improper venue involves a lower burden than dismissing for forum non conveniens.  See Sandvik v. Advent International Corp., 83 F. Supp. 2d 442, 449 (D. Del. 1999).

As set forth above, in Sections I and II of the Argument, this lawsuit could have been brought by Plaintiff in the Northern District of Illinois, and litigation can more appropriately be conducted in the Northern District Court of Illinois, rather than in Delaware, based on the fact that, inter alia, his work was performed from, and in, Illinois; the key witness to his alleged non-performance, which is the gravamen of Plaintiff's Complaint, Tom O'Neil, works and resides in Illinois; documentation relating to Defendant's day-to-day work is located in Illinois; Plaintiff has an office in Illinois; the negotiations and contracting took place in Illinois; and Illinois law should be applied.  Further, requiring the Defendant, an Illinois resident, to travel half way across the country to defend a claim that has no connection with Delaware would be burdensome, inconvenient, unnecessary and expensive.

15

## **CONCLUSION**

For the reasons set forth above, and the authorities in support of the those reasons,

Defendant prays that this Court enter an Order dismissing the Complaint, or in the alternative,

transferring to the Northern District Court of Illinois.

Respectfully submitted,

**RICHARD R. WIER, JR., P.A.**

/s/ Richard R. Wier, Jr.
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

Of Counsel:
Peter M. Katsaros, Esq.
Hughes Socol Piers Resnick & Dym, Ltd.
Three First National Plaza
70 West Madison Street, Suite 4000
Chicago, Illinois 60602-4205
(312)580-0100

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 12th day of July 2006, that I caused the attached document to be filed

with the Clerk of the Court through CM/ECF, which will send notification of said filing to

counsel of record.

**RICHARD R. WIER, JR., P.A.**

   /s/ Richard R. Wier, Jr.
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

Of Counsel:
Peter M. Katsaros, Esq.
Hughes Socol Piers Resnick & Dym, Ltd.
Three First National Plaza
70 West Madison Street, Suite 4000
Chicago, Illinois 60602-4205
(312)580-0100

17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

U.S. CARD PARTNER SERVICES, INC.,    :

        Plaintiff,    :

        v.    :    C.A. No.: 06-283 JJF

DREW SCOPELLITI,    :    JURY TRIAL DEMANDED

        Defendant.    :

## AFFIDAVIT OF DREW SCOPELLITI

I, Drew Scopelliti, being duly sworn, do depose and say that:

1. I am a resident and citizen of Illinois. My address is 4250 N. Marine Drive Apartment 1102, Chicago, Illinois. I have lived at this address for approximately 3 years.

2. Prior to my employment with U.S. Card Partner Services, Inc. (USCPS), which began in December 2004, I worked for Kessler Financial Services (KFS) representing MBNA to the University market for 5 years. I worked from my home in Chicago since my territory was Coast to Coast and Chicago facilitated my coverage of the country. I was responsible for securing the endorsements of major U.S. Universities for MBNA to allow them to market logoed credit cards to their respective alumni. The process involved developing the appropriate contact at the school and convincing them to entertain an offer from MBNA which then competed with other Banks. The university would make a selection of a bank to conduct its offering to alumni based primarily on the financial offer, but also soft benefits.

3. I was recruited by USCPS while employed at KFS.

4. The initial overture in recruitment was made by Stan Cochran of Baltimore, Maryland at a CASE Conference in San Diego, California on Sunday, July 11, 2004.

5. On July 16, 2004, I received in Chicago a pre-employment Agreement for Use and Non-Disclosure of Proprietary Information with USCPS, which I executed and returned.

6. In August 2004, I met with Stan Cochran (USCPS) of Baltimore, Maryland

and Joseph Janz (US Bank) of St. Paul, Minnesota at Gibson's restaurant in Chicago.
The subject matter of the discussion was the range of my contacts in higher education, US
Bank's interest in major University endorsements, their 5 star guarantee and ability to
share greater revenue with the endorsing school owing to a superior efficiency ratio.

7. On August 27, 2004, I received an email with an initial offer from USCPS with
"full support of our partners at US Bank", from Stan Cochran to my significant other at
Northwestern University in Evanston, Illinois.

8. On September 17, 2004, I met with Tom O'Neill at Midway airport in
Chicago. We discussed US Bank's appetite for universities and the prospect of offering
other US Bank products to the university industry.

9. In September 2004, I met with Stan Cochran (USCPS) of Baltimore, Maryland,
Joe Janz (US Bank) of St. Paul, Minnesota, and James Geeslin (US Bank) of Atlanta,
Georgia at McCormick and Schmidts in Chicago, Illinois. We discussed US Bank's
enthusiasm for major universities and the many other kinds of Bank products they could
market to that sector.

10. On September 22, 2004, Tom O'Neil faxed a "Sales Director's earnings"
spreadsheet from New York, New York to me at my home in Chicago, Illinois.

11. On October 7, 2004, I stopped by to see Newark, Delaware office of USCPS.
I was secretly ushered into the conference room and met only with Stan Cochran for
about 10 minutes. We discussed no business; instead, we discussed the conference table
he purchased at a discount that was slightly damaged.

12. On November 15, 2004, I received a revised offer letter via fax to my home in
Chicago. [Exhibit A].

13. During November 15-19, 2004, I had phone conversations with Tom O'Neil
(USCPS) in New York, New York and Stan Cochran (USCPS) in Baltimore, Maryland,
which resulted in a final version of the letter of agreement. At all times, I was in
Chicago, Illinois.

14. On November 15, 2004, I received the employment agreement, confidentiality agreement, which has a choice of law and forum selection clause of Minnesota [Exhibit B], employee's acknowledgement of pre-existing obligations [Exhibit C] and a Code of Ethics [Exhibit D]. On November 19, 2004, I signed the documents and faxed them from Chicago, Illinois to Stan Cochran (USCPS) in Baltimore, Maryland.

15. I began working for USCPS on December 6th from my home in Chicago, Illinois, and held the position of Director, Education Sector. Tom O'Neil (USCPS) relocated his residence from White Plains, New York to Barrington, Illinois. Initially, he worked from his home in Illinois and served as my immediate supervisor.

16. I immediately began securing an audience for US Bank. I hosted a reception in my Chicago home in December of 2004 with the chief executives from Nebraska, Florida State University, Georgia Tech, Florida State, Arizona, Houston, Purdue, UConn, Illinois and executives of US Bank and USCPS.

17. From December 2004 through March 2005, my work was conducted from my home office at 4250 N. Marine Dr. #1102, Chicago, Illinois. In May 2005 Tom O'Neil established the "Chicago office" of USCPS, which was a sublet of a studio apartment at 300 East Randolph, Chicago, Illinois.

18. While an employee of USCPS, the only time that I was in Delaware for business was one sales meeting on January 28, 2005. I was never in, nor did I have contact with, Delaware for any other USCPS business.

19. I was terminated at the Chicago Office on July 26, 2005.

20. During my employment with USCPS,

    A. I did not perform any character of work or service in Delaware;

    B. I did not contract to supply services or things in Delaware;

    C. I did not cause any tortious injury by an act or omission in Delaware;

    D. I did not cause tortious injury in Delaware or outside of Delaware by any act or omission outside of Delaware and I did not solicit business,

engage in any persistent course of conduct in Delaware or derive revenue

from any services or things in Delaware;

E. I did not have an interest in, use or possess any real property in

Delaware; and

F. I never contracted to insure or act as surety in any capacity within

Delaware.

21. While employed by USCPS, my wages came from U.S. Card Partner

Services, Inc., 22 Harvard Ct., White Plains, New York. I never had to pay, nor did I ever

have deducted, any Delaware state tax on my wages.

Drew Scopelliti

SWORN TO AND SUBSCRIBED before me, this 12TH day of July 2006.

OFFICIAL SEAL
KATHLEEN L SASS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/19/08

# EXHIBIT A

**us card**
**PARTNER**SERVICES

111 Sandy Drive
Newark, DE 18713
Phone: 302-733-7500
Fax: 302-733-7548

November 15, 2004

To: Drew Scopelliti

From: US Card Partner Services, Inc. (USCPS)

    This letter agreement sets forth the terms and conditions of your employment as Sales Director for the Educational Sector of US Card Partner Services ("USCPS'):

    1.    <u>Responsibilities.</u> As Sales Director of the Educational Sector for USCPS. Your primary responsibility is to help USCPS attain its partner signing goals relative to the Education Sector. You will manage USCPS Sales Representatives efforts (which as of 11/12/04, Sales Representatives include Armand Gallucci, Chad Longyear, and Michael McGarry) in the Educational Sector. You will also help direct USCPS efforts to identify and secure the next strategic U.S. Bank product to offer into the Education Market. In addition, and upon request of USCPS Management Team you also will participate in sales efforts and have sales goals in other sectors as directed. You will be based in Chicago and work from your home until such time as USCPS opens a regional office. You understand that you must comply with such other employment policies and procedures as may be adopted by USCPS from time to time. You will not be involved in any other business outside USCPS without the approval of USCPS Managing Directors.

6TH

    2.    <u>Term of Employment.</u> Your employment shall commence on December 7, 2004 and shall continue through December 31, 2005. Thereafter, this agreement shall automatically renew for successive periods of one (1) year each, unless terminated by either party upon not less than sixty (60) days prior written notice to the other party. In the event that USCPS terminates your employment on or before December 31, 2006, for reasons other than performance or disciplinary, you shall receive six (6) months base salary beginning from the time of notification of employment termination and will be paid at the monthly rate then currently receiving. USPCS shall determine at its sole discretion whether a lump sum or at monthly interval is appropriate. Such payments shall be made in accordance with USCPS' standard payroll procedure.

    3.    <u>Base Salary.</u> During the first year of this letter agreement, you shall receive an annual base salary of $90,000. A separate non-Salary allotment of $6,000 (ie $500/month will also be received in lieu of health & other benefits. Base salary shall be paid in accordance with USCPS' standard payroll procedure, but not less frequently than monthly.

    4.    <u>Incentive Compensation.</u> In addition to your base salary, you shall be entitled to receive the following commissions and additional compensation ("Incentive Compensation"):

    Commissions: You shall receive Commissions as follows:



**us card**
**PARTNER**SERVICES

111 Bendy Drive
Newark, DE 19713
Phone: 302-733-7500
Fax: 302-733-7548

- For new endorsements attributed to your efforts as primary sales person-
  $1 per each new/unique active account over a three year period.

- For all new Education Sector endorsements sold having 75,000 names or
  more by Sales Representatives reporting to you - $0.25 per each
  new/unique active account over a three year period.

- While you are employed, commissions on signed partner programs shall
  be payable for the first three (3) years of signed programs. The three years
  will begin on the program's Effective Date. Commissions are only
  payable to you while you are employed.

Additional Compensation: In addition to the Commissions described above, you
shall receive further Incentive Compensative per partner signing attributed to your
individual efforts as primary sales person as follows:

- $1,500 bonus for each US Bank signed & completed endorsed program
  which includes up to 50,000 qualified marketable names.

- $2,500 bonus for between 50,001 and 100,000

- $3,500 bonus for between 100,001 and 250,000

- $5,000 bonus for greater than 250,000

For signings in the Education Sector over 75,000 names and procured by Sales
Representatives reporting to you, the Managing Directors will make the final determination of
how and if the bonuses will be paid.

You shall receive, as an advance against Incentive Compensation payable hereunder, an
amount equal to $50,000 per year ("Draws"). Incentive Compensation shall be payable on a
calendar quarterly basis (the first quarter shall include December, 2004) and paid within ten (10)
days of reconciliation of reports from USB to USCPS. Incentive Compensation shall be payable
only to the extent that it exceeds the amount of Draws payable under this Agreement each year.
Thus, if (i) the total of all Incentive Compensation payable during each calendar year exceeds (ii)
the Draws paid to you during such year, USCPS shall pay you the difference on or before ten
(10) days after the reconciliation of reports from USB to USCPS each calendar quarter. For
purposes of illustration and not limitation, if you earned Incentive Compensation of $100,000 in
the first calendar year, you would receive $100,000 less Draws of $50,000, resulting in a net
payment of $50,000. Draw will be cumulative year to year.



**us card**
**PARTNER**SERVICES

111 Sandy Drive
Newark, DE 19713
Phone: 302-733-7600
Fax: 302-733-7548

Upon termination of this agreement for any reason, Incentive Compensation will cease. However USCPS recognizes that under no circumstances shall you be required to repay any Draws received.

5.    **Benefits.** I recognize that USCPS has extended me $6,000 on an annual basis to fund my own benefits. However If USCPS does extend a benefits package in the future you will have the same ability to participate in such benefits if you so choose as other similarly situated employees of USCPS. You shall be entitled to three (3) weeks paid vacation and Company approved paid holidays (one of the 3 weeks will be between Christmas and New Years).

6.    <u>New Product(s)</u>. This section applies only if & when USCPS is contracted to market an additional product into the Educational Sector. You shall receive 25% of USCPS net revenues earned from the first identified and agreed incremental product in the Educational Sector. For purposes of this agreement "net earned revenues" will be defined as Performance Revenues less only the direct incremental Cost to Earn these Revenues. As USCPS is currently covered on Credit/Debit cards, such incremental product may be later identified from such products as mortgage, loan consolidation, etc. While USCPS may expand your inclusion to other products, Managing Directors will determine this in their sole discretion. Any additional compensation for new product(s) shall also go against your cumulative Draw.

7.    <u>Prior Agreements</u>. USCPS is employing you based on your representation that neither your employment with USCPS nor your performance of duties for USCPS will violate the terms of any agreement to which you are a party.

We look forward to a mutually beneficial relationship. Please sign and date below to acknowledge your agreement to the foregoing and return one fully executed original to USCPS.

Very truly yours,

US Card Partner Services, Inc.

ACCEPTED AND AGREED TO THIS
DAY OF _November 19_, 2004.

By: _Drew Scopelliti_
Drew Scopelliti

**us bank.**

# EXHIBIT B

# CONFIDENTIALITY AND
# INTELLECTUAL PROPERTY AGREEMENT

I acknowledge that U.S. Card Partner Services, Inc. (the "Company") operates in a competitive environment, that it enhances its opportunities to succeed by establishing certain policies designed to identify and secure the Company's and U.S. Bank National Association's ("U.S. Bank") confidential information and intellectual property and that the provisions of this Agreement are a material condition to my employment with the Company and U.S. Bank National Association's ("U.S. Bank") willingness to enter into a card program marketing arrangement (the "card marketing arrangement") with the Company. In consideration of the Company's offer of employment and U.S. Bank's entry into the card marketing arrangement with the Company, the foregoing recitals and other good and valuable consideration associated with my employment by the Company, I agree as follows:

1.     <u>Confidentiality.</u>

I will not disclose or use in any manner or at any time either during or after my employment with the Company any Confidential Information (defined below) except (a) for the benefit of the Company and U.S. Bank as required by my duties for the Company or by the card marketing arrangement or (b) as an officer of the Company and U.S. Bank expressly may otherwise consent to in writing. I hereby recognize that all Confidential Information shall be the sole property of the Company and its assigns or, as specified in the card marketing arrangement, U.S. Bank and its assigns.

The term "Confidential Information" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company or U.S. Bank, in any form whatsoever. By way of illustration and not limitation, "Confidential Information" includes (a) trade secrets, inventions, mask works, ideas, processes, methods, formulas, algorithms and other mathematical formulae, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, devices and techniques (collectively known as "Intellectual Property"); (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses (including the identity of and information relating to licensors and licensees), prices and costs, suppliers, distributors, customers, joint venturers and other persons and entities with whom the Company does business or whom were solicited or were eligible to be solicited pursuant to the card marketing arrangement; and (c) information regarding the skills and compensation of other employees and agents of the Company . Notwithstanding the foregoing, I understand that I am free to use information that is generally available to the public.

I understand, in addition, that the Company or U.S. Bank has received and in the future will receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's or U.S. Bank's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I will not

[Sales Representative Form]

2

disclose or use in any manner or at any time either during or after my employment with the Company any Third Party Information except for the exclusive benefit of the Company as required by my duties for the Company (which may include disclosure to the Company's personnel who need to know such information in connection with their work for the Company) or for the benefit of U.S. Bank pursuant to any card marketing program or as an officer of the Company and U.S. Bank expressly may consent to in writing.

2.    Ownership and Assignment of Intellectual Property.

I hereby assign and agree to assign in the future (when any such Intellectual Property are first reduced to practice or fixed in a tangible medium, as applicable) to the Company (or, as may be directed by U.S. Bank pursuant to the card marketing arrangement, to U.S. Bank) all my right, title and interest in and to any and all Intellectual Property (and all Proprietary Rights (defined below) with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. The term "Proprietary Rights" shall mean all trade secret, patent, copyright, mask work, and all intellectual and other property rights throughout the world.

All work product (including all notebooks, files and other tangible products) made, compiled or otherwise produced during the course of my employment as part of the work performed by me for the Company is the property of the Company (or, as may be required by the card marketing arrangement, U.S. Bank). Upon leaving employment with the Company for any reason, I immediately will deliver to the Company (or, as may be required by the card marketing arrangement, U.S. Bank) all such work product, and all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control that contain or disclose Intellectual Property, Third Party Information or Confidential Information of the Company or U.S. Bank.

I further agree that any property situated on the Company's premises and owned by the Company (or, as may be required by the card marketing arrangement, U.S. Bank), including disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company's (or, as may be required by the card marketing arrangement, U.S. Bank's) personnel at any time with or without notice.

3.    Non-Compete and Impermissible Conflicts.

I agree that during and for three months after my employment by the Company, I will not, without the Company's and U.S. Bank's express written consent, engage in any employment or business activity that is competitive with, or would otherwise conflict with, my employment by the Company or U.S. Bank's rights under the card marketing arrangement, in any case anywhere within the United States.

4.    Non-Solicitation.

I agree that during and for six months after my employment by the Company, I will not, without the Company's and U.S. Bank's express written consent, (a) solicit any of the

[Sales Representative Form]

Company's employees or potential employees to obtain employment from any entity other than the Company or (b) solicit any of the Company's customers or potential customers to obtain any form of goods and services from any entity other than the Company.

    5.    <u>Exclusivity and Non-Interference</u>.

    Without limiting the generality of any other provision of this Agreement, I agree that, during and for **six months** after my employment with the Company (and except as U.S. Bank may otherwise agree in its sole discretion), I will not (a) enter into, perform under an agreement or arrangement with, or obtain employment from any financial institution, card issuer or other third person (in each case, other than U.S. Bank) for the marketing or solicitation of any form of financial services (including any credit, charge card, payment card or debit card programs) (the foregoing being "Restricted Programs"). Without limitation of the foregoing, I will not provide any customer lists or lists of potential card marketing partners to any third person for the purpose of marketing any Restricted Program.

    Without limiting the generality of any other provision of this Agreement, I agree that during and for **12 months** after my employment with the Company, or while any affinity or co-branded card program (each, a "card program") originated under the card marketing arrangement remains in effect **but not to exceed 3 years**, I will not interfere in any way with U.S. Bank's rights and interests under such card program, or cause or attempt to cause or to solicit any participant in any such card program to enter into any form of any **competing** financial service marketing arrangement with any person or entity other than U.S. Bank.

    6.    <u>Representations and Warranties</u>.

    I represent that all of the statements and representations made by me in that certain Employee's Acknowledgment of Pre-Existing Obligations dated concurrently herewith (the "Acknowledgement") are true and correct. Without limiting the generality of the forgoing, I represent that my employment with the Company, my handling of the Company's responsibilities under the card marketing arrangement and my compliance with this Agreement do not and will not breach any express agreement to keep in confidence information acquired by me prior to or outside of my employment with the Company. I have not entered into, and will not enter into, any express agreement in conflict with this Agreement.

    7.    <u>Notices to Employers</u>.

    In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

    8.    <u>Notices Under Agreement</u>.

    Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

    9.    <u>Amendments and Waivers</u>.

[Sales Representative Form]

04/24/2006 10:48 FAX 3125801994 GHSPRD,LTD 008/021
NOV-19-2006 Case 1:06-cv-00283-JJF Document 6-2 Filed 07/12/2006 Page 13 of 25

4

My obligations under this Agreement may not be modified or terminated, in whole or in part, except in a writing signed by me, the Company and U.S. Bank. Any waiver by the Company and U.S. Bank of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

10. Separate Provisions.

Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

11. Survival; Binding Nature of Agreement.

My obligations under this Agreement will survive the termination of my employment and the termination of the card marketing arrangement, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company and U.S. Bank.

12. No Right to Continuous Employment.

I understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company or to my employment for any particular term.

13. Remedies.

Any breach of this Agreement likely will cause irreparable harm to the Company and U.S. Bank for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company or U.S. Bank will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

14. Choice of Law and Forum.

This Agreement will be governed by and interpreted in accordance with the laws of the State of Minnesota, excluding its choice of laws rules. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Hennepin County County, Minnesota for any lawsuit related to this Agreement.

15. Complete Agreement.

This Agreement and the Acknowledgement the contains the complete agreement between the Company, U.S. Bank and me concerning the subject matter hereof and supersedes all other agreements and understanding. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the first day of my employment with the Company.

[Sales Representative Form]

5

I have read this Agreement carefully and understand its terms.

Date: 11/19/04

Employee Signature

Employee Name (Printed)

AGREED AND ACCEPTED:

## U.S. BANK NATIONAL ASSOCIATION

By: _____

Its: _____

## U.S. CARD PARTNER SERVICES, INC.

By: _____

Its: _____

[Sales Representative Form]

# EXHIBIT C

## EMPLOYEE'S ACKNOWLEDGEMENT OF PRE-EXISTING OBLIGATIONS

Welcome to U.S. Card Partner Services, Inc.!  U.S. Card Partner Services, Inc. is glad that you have joined our organization.  As we hope you know, U.S. Card Partner Services, Inc. hired you for many reasons, including your intellect, educational background, work experience, skill set, integrity, and enthusiasm for joining the U.S. Card Partner Services, Inc. team.  U.S. Card Partner Services, Inc. considers it equally important for you to understand that U.S. Card Partner Services, Inc. did NOT hire you because U.S. Card Partner Services, Inc. hoped it would gain some competitive advantage over other companies through access to your prior employer's confidential or proprietary information.  Indeed, it is critical that you fulfill your post-termination obligations, if any, to your former employer(s).

To ensure that you comply with any possible obligations you may have to your former employer(s), U.S. Card Partner Services, Inc. requests that you do the following:

(1)    Check your past employment records to determine whether you had a written employment contract with the employer for whom you worked immediately before joining U.S. Card Partner Services, Inc..

(2)    If you have worked for more than one other employer in the last three years, check your past employment records to determine whether you had a written employment contract with the other employers for whom you worked during this time period.

(3)    Check your past employment records to determine whether, at any time within the last three years, you executed any agreement that limited in any way your ability to compete with your former employer(s).

(4)    Check your past employment records to determine whether, at any time within the past three years, you executed an agreement in which you promised not to solicit any of your former co-workers or colleagues to join you as an employee of a future employer.

(5)    Check your past employment records to determine whether, at any time within the past three years, you executed an agreement in which you promised not to solicit or call upon any of the customers or credit card marketing program participants of any of your former employer(s).

(6)    Check your past employment records to determine whether, at any time within the past five years (or longer, if you were continuously employed by another employer for more than five years), you executed an agreement in which you promised not to use or share any confidential or proprietary information belonging to your former employer(s).

(F)    I hereby confirm that there is no express agreement that prohibits me from bringing any proprietary or confidential information belonging to any former employer to the U.S. Card Partner Services, Inc. workplace and have not and will not load any such information onto any U.S. Card Partner Services, Inc. computer.

(G)    I hereby confirm that I have not used and will violate any express agreement that forbids use of any proprietary or confidential information belonging to any former employer.

(H)    I hereby confirm that I have not and will not violate any express agreement that forbids disclosure to any other U.S. Card Partner Services, Inc. employee, any confidential or proprietary information belonging to any former employer.

(I)    I hereby confirm that I have returned to my former employers any materials belonging to them that were in my possession at the time my employment with those employers ended.

(J)    I hereby confirm that my employment with my previous employers have been completely terminated.

(K)    I confirm that I have acted on my own initiative in determining whether to leave my prior employment and have done so to improve my career prospects with U.S. Card Partner Services, Inc.

I understand that if I have misrepresented any of the information addressed above, I could be subject to discipline by U.S. Card Partner Services, Inc., up to and including, termination of my employment.

I further understand and agree that the information addressed above may be relied upon by, and be enforced by, U.S. Bank National Association, which may from time to time enter into credit card, payment card or debit card marketing arrangements with U.S. Card Partner Services, Inc.

Dated: 11/19/04

By: _____
EMPLOYEE

# EXHIBIT D

## USCPS Code of Ethics and Business Conduct

At USCPS, we compete aggressively and ethically in the marketplace, and we will not violate the law or our ethical standards in conducting business activities. An illegal or unethical act cannot be justified by saying it benefited the company, or that it was directed by someone else in the organization, even a higher authority. You are never authorized by the company to commit or to direct another employee to commit such an act. Employees are expected to act lawfully, ethically and professionally in the performance of their jobs at all times. We pride ourselves on the fact that we are clear, truthful and accurate in what we say and do. We always act in a manner that preserves and enhances the reputation of USCPS. Disparaging remarks or comments to or about our customers that compromise or jeopardize our reputation are not acceptable.

Our demands for excellence and the preservation of our integrity and objectivity will be our distinguishing characteristics. We rely on employees to report the discovery of any questionable, fraudulent or illegal activities. Violations should be reported to a USCPS Senior Executive. Our standards are intended to ensure a climate conducive to openness and integrity. They serve to prevent breaches of ethical standards and to provide the framework for ethical behavior. Our standards will also be strictly enforced. Any action or behavior that, in the opinion of USCPS, violates or jeopardizes this standard of honesty, integrity and nondiscriminatory behavior may result in immediate disciplinary action up to and including termination.

### Honesty

Our business is based on mutual trust and absolute honesty in all our affairs, both internally and externally.

Our business demands personal candor and openness by all. We expect of everyone the frankness and objectivity that leads to the earliest identification of real or potential, small or large problems. Any concealment of information for whatever reason is a violation of this Code and may result in disciplinary action up to and including termination.

### Integrity

The nature of our business provides opportunities that can be developed through integrity in our personal and professional business practices.

We must treat all our resources, including our name, with the respect befitting a valuable asset. We should never use them in ways that could be interpreted as imprudent, improper or for personal gain.

### Gifts

As employees, we shall not solicit nor allow ourselves to be solicited or accept gifts, entertainment, or other gratuities intended to or appearing to influence decisions or favors toward the Company's business. Reasonable entertainment and other accommodations may be accepted if offered and accepted in goodwill only and not as a return for special treatment by the Company. USCPS recognizes that the refusal of such gifts may damage relations and in these situations employees should consult with a USCPS Senior Executive regarding the appropriateness of exceptions. Exceptions occasionally are made allowing or encouraging employees to attend events that exceed policy if a significant customer or vendor sponsors an event or attendance at an event is important to maintaining USCPS's relationship with that customer or vendor. Generally, however, gifts are to be limited to a nominal value. Cash or checks cannot be accepted regardless of the amount.

v. (.)

## Other Payments and Uses of Vendor Resources

We shall compete for business only on the basis of the quality and price of our services and to meet our customers' needs today and over time. At no time will we enter into any payment or other arrangement that violates this statement, lowers our ethical standards or could conceivably bring disrepute to USCPS. Gifts, monetary payments, loans, lavish entertainment, or other values or favors made to or received from vendors or other outside parties in exchange for business or influence of any kind are strictly prohibited.

## Personal Benefit

We do not take advantage of our position at USCPS to profit personally from information, corporate property, services or other business opportunities, unless the situation is deemed incidental or authorized by the Company.

## Commitments

We do not make actual or apparent commitments, formally or informally, on behalf of the Company without appropriate authorization in accordance with approved procedures. Approved commitments within the scope of one's authority should be properly documented and retained.

## Compliance

We comply with all local, state and federal laws and regulations that apply to our business. When laws or regulations seem unclear or ambiguous, employees should consult a USCPS Senior Executive if further clarification is needed.

## Maintaining Confidentiality

It is essential that we maintain a professional standard of conduct that assures confidentiality of information and relationships between USCPS and its customers. Confidential information regarding customers or transactions should not be discussed except in the normal transaction of business.

Also, information about how we run our business (such as our strategic plans and our products) or ~~other~~ nonpublic information about customers, must be treated with utmost discretion. Inappropriate discussions or the improper release of information may result in disciplinary action up to and including termination. When your employment ends, your obligation to maintain the confidentiality of information continues to apply.

~~Proprietary Information and Customer Lists~~

~~While at USCPS, as employees, we may produce, develop and have access to information, ideas, inventions, techniques, processes, computer software, "know how," materials, programs, reports, studies, records, data, customers lists, customer information, trade secrets, and other information not generally available to the public regarding USCPS and all related entities, their customers, prospective customers, and other third parties (collectively "Proprietary Information"). Proprietary Information may be original, duplicated, computerized, memorized, handwritten, or in another form.~~

~~Proprietary Information (whether developed or produced by an employee, or provided to an employee by USCPS or a customer or other third party) is entrusted to employees as representatives of USCPS. Employees may not use, duplicate or remove any Proprietary Information except for the~~

v. (.)

~~sole purpose of conducting business on behalf of USCPS. All records, files, documents and other Proprietary Information employees prepare, use or come into contact with shall remain USCPS's property.~~

~~Because it is unique and cannot be lawfully duplicated or easily acquired, this information is USCPS's property with trade secret status and protection. Employees may not use, divulge or disclose Proprietary Information to any third party. Under no circumstances should an employee reveal or permit this information to become known by any competitor of USCPS, or any other third party, either during or after employment.~~

~~We are expected to use reasonable care to prevent the disclosure or destruction of Proprietary Information that we possess or use. If employment with USCPS ends, individuals must return all proprietary Information, including information that may have been retained in personal items (e.g. electronic devices or home computers).~~

~~Employees are paid to work for USCPS and may be using Company facilities and equipment to develop Proprietary Information. As a condition of employment, all employees acknowledge and agree that Proprietary Information is USCPS's sole property and disclaim any rights and interests in any Proprietary Information and assign these rights to USCPS. Additionally, all employees agree to immediately disclose all Proprietary Information to the Company.~~

~~USCPS customer lists and other Proprietary Information about customers and employees are to be treated as highly confidential in all cases. This information may not be disclosed to any third party or used for any purpose other than performance of job duties for USCPS either during or after employment.~~

~~Unauthorized use or duplication of customer lists and other information (including copies in electronic form) is expressly forbidden.~~

## Conflict of Interest

It is a conflict of interest if you have an interest outside of work that interferes with your responsibilities to USCPS or affects your ability to perform your duties properly. You must avoid conflicts of interest and potential conflicts of interest, including situations where there might be an appearance that there is, or could be, a conflict of interest.

Employees of USCPS may not engage in any employment or activity which is in competition with any business of the Company; which conflicts with the fiduciary obligations of any other department; or which creates a conflict of interest with the employee's position or department. In all cases, positions in which you are employed outside of USCPS must be approved in advance by a USCPS Senior Executive.

## Use of Company Resources

Our telephones, personal computers, copy and fax machines, supplies, mail service, including e-mail, bulletin boards and conference rooms are intended for Company business only. Personal use of these or other Company resources can disrupt the vital flow of information or tie up resources our customers depend on. Personal telephone calls should be limited and Company addresses or mail should not be used for personal correspondence. Misuse or abuse of Company resources may result in disciplinary action, including termination. Company resources assigned to you during the course of your employment, must be returned upon termination and/or at the request of USCPS.

## Business Communications and Records

All communications, whether verbal or written, should be conducted professionally and should adhere to our ethical standards. What we say, write and do should reflect a clear understanding of the Company's ethical values and expectations and should demonstrate sound personal judgment.

v. (.)

That means being clear, truthful, and accurate. It also means being respectful. Always avoid exaggeration, colorful language, guesswork, legal speculation, and derogatory remarks or characterizations of people, companies or their products and services. What we say, write or do should preserve or enhance our integrity and reputation - it should never jeopardize it. This policy applies to communications of all kinds, including voice mails, e-mail and informal notes or memos. The following section of this policy provides guidance specifically regarding e-mail communications, but also applies in principle to all other forms of communication as well, including voice mail and memos.

## E-mail

E-mail is an important form of internal and external communication. E-mails are written records and even if deleted, they may be stored and accessed as permanent records. Our ethical standards apply to every e-mail we create - no matter how informal or casual it may be. E-mail should never be created or sent if it does not first pass the scrutiny of our ethical standards.

Like voice mail, computer systems or other office equipment, e-mail is the exclusive property of USCPS and it is not intended for personal use. The sharing or transmission of jokes, excessive use of e-mail for non-business matters, or other unauthorized use of e-mail is never appropriate. All e-mails should be created with the understanding they may be formal records. They should be written in a professional tone and they must be protected from unauthorized disclosure or access.

USCPS's Offensive Behavior Policy applies equally to electronic communications. No e-mail messages should be sent which may be perceived as offensive, intimidating or hostile. USCPS reserves the right to monitor any employee's e-mail and computer files for any reason, including when there is a reasonable suspicion that some employee use of these systems violates criminal or civil law, violates a Company policy, or may have an adverse effect on the Company or its employees. Examples include but are not limited to e-mails containing sexual innuendo or off-color jokes; chain letters; downloading, copying or sending confidential information to an unauthorized party; excessive or unauthorized personal use that violates Company policy. It is important to keep in mind that all public statements about USCPS must be accurate and consistent. When using Internet communications such as online forums, bulletin or message boards and chat rooms, it may sometimes give the appearance that you are communicating with a small group. You may, however, potentially be communicating with a very large audience. USCPS prohibits such communications purported to be on behalf of USCPS or in your capacity as an employee. Only authorized spokespersons may communicate about the Company and its policies, practices and procedures. USCPS treats Internet communications like any other publication.

## Media Contacts

USCPS and its affiliates are committed to building and maintaining effective and ongoing communications with key stakeholders through the media. Effective media relations also ensure that USCPS's public statements express a clear and factual representation of the Company. It is the policy of USCPS that all media inquires will be forwarded to a USCPS Senior Executive. Only a Senior Executive is authorized to initiate contact with the media.

## Respect and Consideration in Our Dealings with All

Our goal is to treat fellow employees with respect, consideration and understanding. Our intention is to foster a climate conducive to a high level of performance through full communication at all

levels. We encourage the open discussion of job-related problems and prompt resolution of those problems.

Externally, we must treat customers, potential customers, vendors and the communities we serve with equal respect. This demands courteous service, as well as ethical business conduct and compliance with all laws and regulations. We have the responsibility to always act in ways that reflect favorably on USCPS. USCPS is legally prohibited from doing anything that can be construed as an unauthorized practice of law. Employees should refrain from offering any advice where they lack professional qualifications.

Being considerate and open in our dealings demands the development, encouragement and maintenance of a positive attitude towards ethical behavior, one important dimension of which is an open appreciation of diversity. It is absolutely essential for us to value and respect differences among the people with whom we interact daily. When we are able to manage effectively our reaction to diversity, we can be more successful in identifying and meeting customer needs and developing effective work relationships, thereby increasing productivity.

We must be compelled to conduct our day-to-day business with the highest standards of integrity, and we must devote our complete efforts to successfully performing our jobs to ensure the attainment of our Company goals and objectives. It is in this spirit that all USCPS employees are expected to act.


## Equal Employment Opportunity/Affirmative Action

USCPS has made a commitment to create a work environment that values each individual's unique talents and background, respects differences, and recognizes the opinions and ideas of every employee.

USCPS is committed to Equal Employment Opportunity (EEO). Embracing diversity is not only the right way to do business, it is essential to the success of our business.

By sharing the responsibility for promoting EEO, you help ensure that your work environment is free from unlawful discrimination.


## Offensive Behavior and Harassment

It is the Company's policy and the responsibility of all employees to maintain a working atmosphere free of harassment, intimidation and/or unwelcome or inappropriate conduct, including sexual overtures, jokes, graphic material, etc. Verbal or physical conduct of a demeaning or sexual nature that creates an intimidating, hostile or offensive working environment, that in any way affects the employment relationship or is otherwise deemed to be inappropriate by the Company is not permitted.


## Use of USCPS Technology

Technology, including computer hardware and software, is an important asset for USCPS and our customers. Leading-edge technology is a significant component of the services we provide to our customers.

All employees who use USCPS's technology resources must become familiar with and understand our policies and standards and comply with their provisions.

Some of these basic rules include, but are not limited to, the following:


## Use Resources and Data Only for Authorized Purposes.

Do not attempt to access data that you are not authorized to access.

v. ()

Ensure information is treated as a valuable Company asset and is disclosed only on a need-to-know basis.

Use all software in accordance with its license agreements.

Do not make any unauthorized copies of any software under any circumstances. Anyone found copying software other than for backup purposes is subject to disciplinary action, including termination.

Do not use USCPS computer resources for personal business.

Do not access inappropriate Internet sites.

## Computer and Information Security

Protecting information from unauthorized disclosure is a responsibility of all employees. In general, here are a few basic rules to keep in mind:

Ensure that all of your computer access is on a need-to-know basis and is limited to the information required to perform your job.

Provide for the physical security of the hardware. Laptop computers and system components are extremely vulnerable to theft.

Ensure you have power-on and screensaver passwords on your personal computers.

Ensure you have current virus detection software on your computer.

Do not write down access codes or passwords.

Do not share your user ID or passwords with anyone. You are responsible for all unauthorized use of your user ID.

Change your passwords if you suspect your user ID has been compromised and contact Information Security Services.

## Serving as an Expert

The expertise you develop in the course of your employment may provide opportunities to participate in outside activities as a paid or unpaid speaker or consultant. It is important to discuss these opportunities with a USCPS Senior Executive to ensure there is no conflict between organizational and personal interests. Use or distribution of materials or products developed as part of your responsibilities with USCPS should occur only with the authorization of a USCPS Senior Executive.

## Privacy in the Workplace

USCPS may assign workspace, equipment or other Company property for use in performing your job accountabilities. Company property is not intended for personal use. USCPS reserves the right to access and/or search workspace and equipment that has been assigned to you. Equipment owned by employees but used for USCPS business purposes is not considered private and may be accessed and searched for any purpose. We also reserve the right to monitor employee accounts and electronic forms of communication, including e-mail, telephones, computer systems and other electronic records for any reason.

In addition, USCPS prohibits unauthorized recordings of conversations, meetings, etc.

I have read this Agreement carefully and understand its terms.

Date: _11/19/04_

v. (.)

_____
Employee Signature

_____
Employee Name (Printed)

AGREED AND ACCEPTED:


**U.S. CARD PARTNER SERVICES, INC.**


By: _____

Its: _____

v. (.)

LEXSEE 2002 U.S. DIST LEXIS 4087

**BART A. BROWN, JR., AS CHAPTER 7 TRUSTEE FOR: FOXMEYER CORPORATION, FOXMEYER DRUG COMPANY, HEALTHCARE TRANSPORTATION SYSTEMS, INC., MERCHANDISE COORDINATOR SERVICES CORPORATION, FOXMEYER SOFTWARE, INC., AND HEALTH MART, INC., Plaintiff, v. THE BUSCHMAN COMPANY, WHITE SYSTEMS, INC., McHUGH SOFTWARE INTERNATIONAL, INC., ALVEY SYTEMS, INC., AND PINNACLE AUTOMATION, INC., Defendants,**

**Civil Action No. 99-108 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 4087*

**March 12, 2002, Decided**

**DISPOSITION:** [*1] Defendant Buschman's Motion to Dismiss GRANTED as to Counts Two, Four, Five, Six, Seven and Eight. The motion is DENIED as to Count Eight for defendants White and Pinnacle. Defendant McHugh's Motion to Dismiss is GRANTED in part and denied in part. The defendants' request to dismiss the non-involved plaintiffs is GRANTED. Defendant Buschman's Motion to Extend Time to Answer or to Stay is DISMISSED as MOOT.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, trustee, debtor, and non-involved debtors, sued defendants, managing company, software company, systems company, and other companies (companies), alleging various claims for breach of contract, breach of warranties, fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel. The software company moved to dismiss and the other companies also moved to dismiss.

**OVERVIEW:** The debtor was a distributor engaged in buying and selling medical supplies to hospitals and pharmacies throughout the nation. It had been in business for nearly a century and was the fourth largest distributor of pharmaceuticals in the United States. The debtor contracted with the companies to create a fully integrated warehousing system. The companies were unable to work together and the debtor alleged their failures cost it millions of dollars which led to its bankruptcy. The court held that review of the software company's contract did not contain an express warranty that its software would function with the other companies components, however, whether the software company used its best efforts was a fact intensive inquiry. The disclaimers were valid and the

trustee did not show any tangible damages to support the breach of implied warranty claims. The trustee failed to allege specific facts with regard to the fraud claims and the alleged statements were mere puffing. The economic loss doctrine limited recovery for purely economic losses and the negligent misrepresentation claims failed to show any tangible, physical damage to property or any other non-economic damages.

**OUTCOME:** The motions to dismiss were denied with regard to claims of breach of contract, express warranties but only with regard to the warranty to use best efforts, and was denied with regard to the claim of promissory estoppel as to the systems company and the managing company. The motions were granted in all other respects. The request to dismiss the non-involved debtors was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] In ruling on a motion to dismiss, the factual allegations of the complaint must be accepted as true. Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. A court should dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN2] A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy

before it.

***Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview***
[HN3] In Delaware, express choice of law provisions in contracts are generally given effect.

***Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview***
[HN4] With regard to choice of law, in Delaware, the place of performance must be considered.

***Contracts Law > Contract Interpretation > General Overview***
[HN5] Under Wisconsin law, contracts are to be construed as they are written.

***Civil Procedure > Pleading & Practice > Pleadings > Time Limitations > Computation***
***Contracts Law > Breach > General Overview***
***Contracts Law > Contract Conditions & Provisions > Express Warranties***
[HN6] With regard to a contract's best efforts clause it can be satisfied by any of a wide range of possible levels and types of performance that comport with the exercise of good faith by the obligor.

***Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Conspicuous***
***Commercial Law (UCC) > Sales (Article 2) > Warranties > Exclusion & Modification***
***Contracts Law > Sales of Goods > Warranties > Merchantability***
[HN7] The Uniform Commercial Code as adopted by both Ohio and Wisconsin will permit a party to disclaim the implied warranty of merchantability as long as the language uses the word "merchantability" and is conspicuous. *Ohio Rev. Code Ann. § 1302.29*, cmt. n. 3; *Wis. Stat. Ann. § 402.316(2)*.

***Commercial Law (UCC) > Sales (Article 2) > Contract Terms > General Overview***
***Contracts Law > Contract Conditions & Provisions > Implied Warranties > Merchantability***
***Contracts Law > Sales of Goods > Warranties > Merchantability***
[HN8] See *Ohio Rev. Code Ann. § 1302.29*, cmt. n. 3.

***Commercial Law (UCC) > Sales (Article 2) > Contract Terms > General Overview***
[HN9] See *Wis. Stat. Ann. § 402.316(2)*.

***Commercial Law (UCC) > Sales (Article 2) > Contract Terms > General Overview***

***Contracts Law > Contract Conditions & Provisions > Implied Warranties > Merchantability***
***Contracts Law > Contract Conditions & Provisions > Implied Warranties > Fitness***
[HN10] See *Ohio Rev. Code Ann. § 1302.29*.

***Commercial Law (UCC) > Sales (Article 2) > Contract Terms > General Overview***
***Commercial Law (UCC) > Sales (Article 2) > Warranties > Exclusion & Modification***
[HN11] Under Wisconsin law, with regard to implied warranties, the purpose of disclaimers is to prevent surprise. *Wis. Stat. Ann. § 402.316(2)*, cmt. 1.

***Commercial Law (UCC) > Sales (Article 2) > Contract Terms > General Overview***
[HN12] Under the Uniform Commercial Code, if a party is not surprised by the disclaimer, it will be deemed valid despite technical deficiencies. There is no need to determine whether a disclaimer is conspicuous where the buyer's knowledge of disclaimer can be inferred or when the buyer has actual knowledge of the disclaimer.

***Civil Procedure > Federal & State Interrelationships > General Overview***
***Contracts Law > Contract Conditions & Provisions > General Overview***
***Contracts Law > Defenses > General Overview***
[HN13] A contract clause cannot be invalidated on the basis of fraud unless the particular clause in question was procured by fraud.

***Contracts Law > Breach > Causes of Action > Breach of Warranty***
***Torts > Products Liability > Breach of Warranty***
[HN14] In Ohio, where breach of implied warranty is asserted against one who is not a party to a contract, the claim must be construed as a tort claim.

***Contracts Law > Sales of Goods > Damages & Remedies > Buyer's Damages & Remedies > General Overview***
***Torts > Damages > Compensatory Damages > Property Damage > Award Calculations***
[HN15] Under Ohio law, the economic loss doctrine prevents recovery in tort for purely financial losses. In the absence of injury to persons or damage to other property the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence. Ohio has grouped economic loss into two categories – direct and indirect. Direct economic loss results from the diminished value of the defective product itself. Conversely, indirect economic loss comprises lost profits and consequential losses.

2002 U.S. Dist. LEXIS 4087, *1

*Torts > Damages > Compensatory Damages > Property Damage > General Overview*
[HN16] In Ohio, in order to recover indirect economic damages in a negligence action, a plaintiff must prove that the indirect economic damages arose from tangible physical injury to persons or from tangible property damage.

*Contracts Law > Breach > Causes of Action > General Overview*
[HN17] Ohio courts require parties to clearly plead the terms of the contract that were allegedly breached.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN18] In Ohio, in order to prove fraud, a plaintiff must demonstrate that there was : (1) a misrepresentation; (2) of a material fact; (3) made with knowledge of its falsity, or reckless disregard for its truth or falsity; (4) upon which the plaintiff justifiably relied; and (5) a resulting injury proximately caused by the reliance.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN19] In Wisconsin, a plaintiff must prove (1) false representation; (2) intent to defraud; (3) reliance upon the false representation; and (4) damages.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN20] *Fed. R. Civ. P. 9(b)* dictates that a plaintiff must plead fraud with specificity.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN21] Statements regarding expectations and predictions are not actionable fraud unless a party makes a promise knowing that it cannot or will not be kept.

*Torts > Damages > General Overview*
[HN22] Wisconsin economic loss doctrine does not permit parties to reallocate contractually bargained for risk by pleading economic losses in tort. There must be actual physical harm to property other than the product to overcome economic loss doctrine.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
*Torts > Damages > Compensatory Damages > Property Damage > General Overview*
[HN23] In both Ohio and Wisconsin, in order to prevail in a negligent misrepresentation claim, the statements at issue must be false.

*Contracts Law > Consideration > Promissory Estoppel*
[HN24] Under Ohio and Wisconsin law, a valid contract is a bar to a promissory estoppel claim.

*Contracts Law > Consideration > Promissory Estoppel*
[HN25] A promissory estoppel claim can be viable where the contract fails to address the essential elements of the parties' total business relationship. The exception applies where the promises allegedly relied on by the parties do not make it into the contract.

*Contracts Law > Consideration > Promissory Estoppel*
*Contracts Law > Sales of Goods > Form, Formation & Readjustment > Statutes of Frauds > Formal Requirements*
*Contracts Law > Statutes of Frauds > General Overview*
[HN26] In Ohio, the statute of frauds requires a party to provide some proof that a contract exists. *Ohio Rev. Code Ann. § 1302.04.*

*Contracts Law > Consideration > Promissory Estoppel*
*Contracts Law > Statutes of Frauds > General Overview*
[HN27] If the statute of frauds requires proof of a contract but no contract is required for a promissory estoppel claim, the statute of frauds is an inadequate defense to that claim.

COUNSEL: For BART A. BROWN, JR., FOXMEYER DRUG COMPANY, HEALTHCARE TRANSPORTATION SYSTEMS INC., MERCHANDISE COORDINATOR SERVICES CORPORATION, FOXMEYER SOFTWARE, INC., HEALTH MART INC., plaintiffs: Scott J. Jensen, Saul Ewing LLP, Wilmington, DE.

For BUSCHMAN COMPANY, WHITE SYSTEMS INC., ALVEY SYSTEMS INC., PINNACLE AUTOMATION, INC., defendants: [*2] Charles S. Crompton, Jr., Potter Anderson & Corroon, LLP, Wilmington, DE.

For MCHUGH SOFTWARE INTERNATIONAL, INC., defendant: Brett D. Fallon.

For MCHUGH SOFTWARE INTERNATIONAL, INC., defendant: Brett D. Fallon, Morris, James, Hitchens & Williams, Wilmington, DE.

JUDGES: Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Gregory Moneta Sleet

OPINION:

## MEMORANDUM AND ORDER

### I. INTRODUCTION

On February 26, 1999, plaintiff Bart Brown ("Trustee"), filed this complaint as Chapter 7 trustee on behalf of the above named plaintiff corporations. The Trustee's complaint arises out of transactions that the defendants — Buschman, White, McHugh, Alvey, and Pinnacle — entered into with the Foxmeyer Corporation ("Foxmeyer"). The Trustee alleges that the defendants intentionally or negligently misrepresented their ability to install the warehouse computer equipment Foxmeyer ordered, and that this failure resulted in Foxmeyer's ultimate financial demise. Count One alleges breach of contract against McHugh and Buschman. Count Two alleges breach of contract against White on a third party beneficiary theory. Count Three alleges breach of express warranties against McHugh and Buschman. [*3] Count Four alleges Breach of Express and Implied Warranties against Buschman, McHugh, White, and Alvey. Count Five alleges fraudulent misrepresentation against all of the defendants. Counts Six and Seven allege negligent misrepresentation and negligence, respectively, against all defendants. Count Eight alleges promissory estoppel against Buschman, McHugh, White, and Pinnacle. The Trustee seeks, *inter alia*, consequential damages as a result of the defendants' alleged breaches and misrepresentations.

Presently before the court are two motions to dismiss for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. McHugh has filed one motion to dismiss (D.I. 17) and the remaining defendants have filed a separate motion (D.I. 24). In their motions, the defendants raise similar defenses. McHugh argues that Count One should be dismissed because it is dependent on the breach of express warranties that were not breached or implied warranties which were properly disclaimed. n1 White alleges that the Trustee has not properly plead the terms of the contract it allegedly breached. In response to Counts Three and Four, McHugh and Buschman aruge that the warranties were [*4] properly disclaimed, while White and Alevy argue that the lack of a contract bars any warranty claims. The defendants further assert that Count Five should be dismissed for failure to plead with specificity and failure to allege scienter. Additionally, the defendants allege that the negligent misrepresentation and negligence claims are precluded by the economic loss doctrine. Finally, Buschman, McHugh, White, and Pinnacle argue that Count Eight should be dismissed because promissory estoppel does not apply to a written contract, or, in the alternative, the statute of frauds will bar the claim.

n1 Buschman has not moved to dismiss the breach of contract or express warranty claims against it in Counts One and Three. Therefore, the plaintiff will be permitted to proceed against Buschman on these claims.

The court agrees with the defendants that certain of the claims should be dismissed. However, the court also finds that other claims may be viable. The court will, therefore, deny the motions to dismiss as to Counts [*5] One, Three (as to the warranty to use best efforts only), and Eight (as to White and Pinnacle). However, the court will dismiss the claims stated in Counts Two, Three (as to any remaining warranties), Four, Five, Six, Seven, and Eight (as to McHugh and Buschman). Additionally, the court will strike all of the non-involved debtor plaintiffs (Healthcare Transportation Systems, Inc., Merchandise Coordinator Services Corporation, Foxmeyer Software, Inc., and Health Mart, Inc.) from this action. The court will now explain the reasons for its ruling.

### II. FACTS

Foxmeyer was a distributor engaged in buying and selling medical supplies to hospitals and pharmacies throughout the nation. It had been in business for nearly a century prior to its bankruptcy, and was the fourth largest distributor of pharmaceuticals in the United States. According to Foxmeyer, the nature of its business dictated that customer orders be filled as quickly and accurately as possible. In 1993, Foxmeyer began exploring ways to achieve greater distribution efficiencies in its Ohio warehouse, known as the WCH warehouse. Foxmeyer eventually began discussions with the "Pinnacle Companies"– Buschman, White, Alvey, [*6] Pinnacle, and McHugh. The Pinnacle Companies proposed that they could create a fully integrated warehousing system for Foxmeyer. Buschman would provide the conveyers (which were designed by Alvey), White would provide the carousels, and McHugh would provide the software. Pinnacle was responsible for managing and coordinating the projects.

Foxmeyer alleges that the Pinnacle Companies made various statements during the contract negotiations. n2 First, Foxmeyer asserts that the Pinnacle Companies stated that their system would enable Foxmeyer to process 135,000 invoices per night, save money, achieve faster delivery, and otherwise increase productivity. (D.I. 1 at PP 20,21.) Second, the Pinnacle Companies touted the technical expertise of its staff and its ability to complete the project by April 1995. (*Id.* at P 21.) Third, the Pinnacle Companies made various representations about the quality of their product in an Executive Summary, using terms such as the "finest" equipment, the "best" equip-

2002 U.S. Dist. LEXIS 4087, *6

ment," "seamless data communications," and the like. (*Id.*) Finally, the Pinnacle Companies allegedly made numerous statements regarding their skill and experience at working together as [*7] a coordinated team.

> n2 Due to sheer numerosity, the court will not delineate each individual statement allegedly made by the Pinnacle Companies. The court has grouped the statements into the four categories that are described above.

Foxmeyer alleges that based in part on these representations, it entered into a contract with the Pinnacle Companies in September 1994. On September 1, 1994, Foxmeyer signed a contract with McHugh wherein McHugh agreed to "develop, assemble and provide to Customer [Foxmeyer Drug] a computer system . . . consisting of certain data-processing systems and programs . . ." (D.I. 19 at P 1.1 (McHugh Contract)). McHugh does not mention any of the other Pinnacle Companies in the contract. In section 6 of the contract discusses warranties. In section 6.1, McHugh warrants that its equipment will conform in all material respects to specifications, but that this warranty would expire after one year. (*Id.* at P 6.1.) McHugh further warranted to use its "best efforts" in resolving any mechanical [*8] failures. Additionally, section 6.3 contains a warranty disclaimer stating that "except as expressly set forth in this agreement, vendor [McHugh] disclaims any and all promises, representations, and warranties, express or implied, with respect to the computer system . . . including all warranties . . . of merchantability or fitness for a particular purpose . . ." (*Id.* at P 6.3) The disclaimer is in the same type size and font as the surrounding sections and paragraphs. Finally, the McHugh Contract indicated that Wisconsin law would control, and that the contract represented the final agreement between the parties. (*Id.* at PP 13.8, 13.9.)

On September 9, 1994, Foxmeyer signed a contract with Buschman, wherein Buschman agreed to supply both the Buschman conveyors and the White carousels. (According to the Trustee, White would subcontract with Buschman. (D.I. 1 at P 24.)) Article 16 of the Buschman contract stated. "THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN AS SPECIFICALLY SET FOR ABOVE." (D.I. 25, Exh. A at 119 (The Buschman Contract).) The typeface is completely [*9] in capital letters, whereas the surrounding paragraphs are printed in normal sentence case. The contract also indicates that it should be interpreted according to Ohio law. (*Id.* at 120.)

Shortly after the contracts were signed, the Pinnacle Companies began working on their various portions of the warehouse inventory system. As the work progressed, the system experienced numerous problems. There were several problems with Buschman's components, and McHugh's computer software was incompatible with the other Pinnacle Companies' products. Moreover, Foxmeyer alleges that rather than working together, the Pinnacle Companies bickered endlessly as it was apparently the first time these particular Pinnacle systems (conveyors, carousels, and software) were integrated into one system. Foxmeyer alleges that these malfunctions caused the WCH warehouse to open in August 1995, five months later than scheduled.

In February 1996, Foxmeyer complained to the Pinnacle Companies about the lack of coordination and project management. The "Pinnacle Task Force" was formed to address the problems. Despite the efforts, the WCH warehouse system was not fully operational until August 1996. Foxmeyer alleges [*10] that the cost overrun, coupled with the extra money it expended to compensate for the faulty warehouse, cost it millions of dollars. Moreover, Foxmeyer alleges that it suffered "massive losses of inventory." (D.I. 1 at P 37.) Foxmeyer filed for Chapter 7 bankruptcy in August 1996, and was liquidated in November 1996. In November 1996, Foxmeyer's purchaser signed a document indicating that all warranty work by McHugh was complete.

### III. STANDARD OF REVIEW

[HN1] In ruling on a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery, 117 F.3d 723, 726 (3d Cir. 1997); Nami v. Fauver, 82 F.3d 63, 65 (3d Cir.1996).* Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969); Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991).* A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See* [*11] *Graves, 117 F.3d at 726; Nami, 82 F.3d at 65* (both citing *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*).

### IV. DISCUSSION

The court will now determine whether the Trustee's claims will be dismissed. Before discussing the claims, however, the court will address the choice of law issues presented.

#### A. Choice of Law

The court accepts the view of the parties that Wisconsin law governs the McHugh contract and Ohio law governs the remaining defendants. [HN2] A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy before it. *Hionis Int'l Enterprises, Inc. v. Tandy Corp., 867 F. Supp. 268, 271 (D. Del. 1994)* (citing *Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4, 46 L. Ed. 2d 3, 96 S. Ct. 167 (1975); Klaxon Co. v. Stentor Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)).* Therefore, the court will apply Delaware's choice of law rules.

[HN3] In Delaware, express choice of law provisions in contracts are generally given effect. [*12] *See Weiss v. Northwest Broadcasting, 140 F. Supp. 2d 336, 342 (D.Del. 2001)* (citing *Hionis, 867 F. Supp. at 271.* In the present case, the McHugh contract clearly states that it will be construed according to Wisconsin law. Similarly, the Buschman contract states that Ohio law will control. The parties do not dispute these assertions, and the court sees no reason to disturb the parties' choice of law. The court will, therefore, apply Wisconsin law to the claims against McHugh and Ohio law to the claims against the remaining defendants. n3

> n3 The court recognizes that White, Alvey, and Pinnacle were not parties to the Buschman contract. Nevertheless, their actions are also governed by Ohio law. [HN4] In Delaware, "the place of performance" must be considered. *Liggett Group v. Affiliated FM Ins. Co., 788 A.2d 134, 141 (Del. Super. 2001).* In the present case, the WCH warehouse – the place of performance – was located in Ohio. Therefore, the court will also apply Ohio law to the claims against the non-contracting parties.

[*13]

### B. Foxmeyer's Claims Against the Defendants

1. Counts Three and Four – Breach of Express and Implied Warranties

a. Breach of Contract and Breach of Express Warranty against McHugh

Count One of the complaint alleges that McHugh "materially breached" its contract with Foxmeyer, but does not state which terms were breached. The complaint then asserts breach of express and implied warranty claims against McHugh in Counts Three and Four. Given the Trustee's failure to identify a specific breach in Count One, the court will assume that the alleged breach of contract flows from the alleged warranty breaches. n4 Therefore, the resolution of the warranty claims will re-

solve the breach of contract issue as well.

> n4 The Trustee apparently agrees with this characterization because he did not respond when McHugh made this argument.

The Trustee's claim against McHugh for breach of express warranty rests upon the McHugh's express warranty that its software would be free of defects, comport with the Functional and [*14] Equipment Specifications, and that it would use its best efforts to remedy any problems. McHugh asserts that the Trustee's allegations are not based on the organic defects of the McHugh software, but rather the software's failure to work properly with the other warehouse components. McHugh states that it did not warrant that all of the components would work together, and therefore, the claim should be dismissed.

The court is persuaded by McHugh's contention that the claim here centers around the failure of the McHugh software to work with the other Pinnacle Companies' products. Although the complaint does mention some instances of McHugh's software deficiency, they all occur in the context of failure to work with the other components. In fact, in his reply brief, the Trustee states that the complaint "details how McHugh's software failed to comply with certain design plans [with the other Pinnacle Companies' components] because of its numerous defects . . ." (D.I. 30 at 28 n.14.) Thus, it seems reasonable to conclude that the gist of the complaint is for the failure of McHugh's software to function with the other components.

In light of the court's conclusion that the claim is [*15] primarily for the failure of McHugh's software to properly function with the other Pinnacle Companies' products, the court must consider whether the express warranty covered that defect. McHugh argues that the contract does not contain an express warranty regarding its software's ability to function with other Pinnacle Company components. Indeed, a careful review of the contract reveals that there is no such warranty. The court will not re-write the warranty to create that result. *See Kennedy v. National Juvenile Detention Ass'n, 187 F.3d 690, 694 (7th Cir. 1999)* ("[HN5] Under Wisconsin law, contracts are to be construed as they are written.").

However, the Trustee also argues that McHugh's warranty to use its best efforts was breached. In response, McHugh contends that it was only required to use its best efforts upon receiving notice of a software problem. McHugh alleges that Foxmeyer failed to provide notice. Conversely, the complaint alleges that Foxmeyer made numerous complaints about the software to McHugh as well as the other Pinnacle Companies. Given the disputed

factual record on this point, the court is reluctant to dismiss this count entirely at this time. n5 [*16] Moreover, whether McHugh used its best efforts is a fact intensive inquiry. *See United States v. Board of Educ. of City of Chicago, 799 F.2d 281, 292 (7th Cir. 1986)* (noting that [HN6] a best efforts clause "can be satisfied by any of a wide range of possible levels and types of performance that comport with the exercise of 'good faith' by the obligor."). For these reasons, the court will not dismiss the breach of contract or breach of express warranty claims against McHugh as they relate to the failure to use best efforts at this time.

> n5 McHugh asserts that the "release" signed by it and Foxmeyer's successor–in–interest declaring that the warranted work had been completed absolves it from any liability on the notice issue. The court disagrees. The release was not signed until November 1996, after Foxmeyer became insolvent and filed for bankruptcy. Thus, if Foxmeyer provided notice prior to the bankruptcy, a subsequent release would not prove that McHugh's best efforts were employed before the insolvency.

[*17]

Although the court will not dismiss the Trustee's claim at this time, the court is also aware that the factual record on the notice issue is largely based on conclusory allegations. For instance, although the Trustee states that "frequent demands for corrective action" were made, he never states when these demands were made. The court will, therefore, permit the trustee to amend the complaint on this issue to provide more facts establishing the context of how, when, where, and to whom, notice was provided. n6

> n6 The court further notes that although it is permitting the breach of contract and breach of express warranty claims against McHugh to proceed, the Trustee cannot recover consequential damages from McHugh. As McHugh points out, section 6.4 of the Foxmeyer–McHugh contract expressly limits damages to claims for fees paid to McHugh. (D.I. 18 at 16.) Section 6.5 clearly excludes consequential damages. (*Id.*) Therefore, although these claims will be allowed to proceed, the Trustee's relief will be limited as provided by the terms of the contract.

[*18]

b. Breach of Implied Warranty against McHugh and Buschman

The Trustee also argues that McHugh and Buschman breached their implied warranties. In response, both McHugh and Buschman argue that the warranties were effectively disclaimed. Indeed, [HN7] the Uniform Commercial Code as adopted by both Ohio and Wisconsin will permit a party to disclaim the implied warranty of merchantability as long as the language uses the words "merchantability" and is conspicuous. *See* [HN8] *OHIO REV. CODE ANN. § 1302.29*, cmt. 3 ("Disclaimer of the implied warranty of merchantability is permitted . . . with the safeguard that such disclaimers must mention merchantability and in case of a writing must be conspicuous."); [HN9] *WISC. STAT ANN. § 402.316 (2)* (same). A warranty of fitness for a particular purpose may be disclaimed if it is in writing and is conspicuous. *See id.* ("[HN10] To exclude or modify any implied warranties of fitness the exclusion must be by a writing and conspicuous."); *OHIO REV. CODE ANN. § 1302.29* (same).

The parties do not dispute that the language used would be appropriate to disclaim warranties of both fitness and merchantability. However, the Trustee submits that McHugh's waiver is not [*19] conspicuous. Unlike Buschman, McHugh did not set forth its disclaimer in capital letters or different type. (Although McHugh asserts that the "disclaimer" heading is in bold typeface, the Trustee correctly points out that all of the headings are in bold.) Therefore, the Trustee claims the McHugh warranty was not effectively disclaimed.

Although it is clear that a disclaimer that is placed in bold type or capital letters is more conspicuous than one that is not, this is not the end of the inquiry. [HN11] The purpose of disclaimers is to prevent surprise. *See WISC. STAT ANN. § 402.316(2)*, cmt. 1 ("This section is designed principally to . . . protect a buyer from unexpected and unbargained language of disclaimer."). To that end, [HN12] if a party was not surprised by the disclaimer, it will be deemed valid despite technical deficiencies. *See Twin Disc, Inc. v. Big Bud Tractor, Inc., 772 F.2d 1329, 1335 n. 3 (7th Cir. 1985)* (noting that there is no need to determine whether a disclaimer is conspicuous where "the buyer's knowledge of disclaimer can be inferred [or] when the buyer has actual knowledge of the disclaimer."). In the present case, the Trustee does not allege that [*20] Foxmeyer was unaware of or surprised by the disclaimer. Indeed, Foxmeyer was a very sophisticated company – the fourth largest in its field. Thus, it is unlikely that it would enter into a contract where it was unaware of the provisions. Therefore, the court finds that the disclaimer was not unexpected and is, therefore, valid.

The Trustee also asserts that both the McHugh and Buschman disclaimers are ineffective because they were procured by fraud. The court rejects this argument for two

reasons. First, for reasons that will be explained below, the court finds that there was no fraud in the formation of the contract. Second, even assuming that the contract was procured by fraud, [HN13] a contract clause cannot be invalidated on the basis of fraud unless the particular clause in question was procured by fraud. *See General Envrinomental Science Corp. v. Horsfall, 753 F. Supp. 664, 675 (N.D.Ohio 1990)* (rejecting the plaintiff's argument that fraud should invalidate contract provision where the plaintiff "alleges only general fraud, not fraud in the inducement to enter into the choice of law provision."); *Polar Mfg. Corp. v. Michael Weinig, Inc., 994 F. Supp. 1012, 1015 (E.D.Wis.1998)* [*21] (noting that contract clause would be enforced unless "the *provision* was procured by fraud or overreaching.") (emphasis added). Here, the Trustee has provided no facts that would allow the court to find that either warranty clause was induced by fraud. The court therefore finds that the clauses were not procured by fraud. Thus, both disclaimers were valid and no breach of implied warranty action can proceed against McHugh or Buschman.

c. Breach of Implied Warranty against Alvey and White

The breach of implied warranty claims against Alvey and White must also fail. As the defendants point out, neither White nor Alvey was a party to the either the Buschman contract or the McHugh contract. [HN14] In Ohio, where breach of implied warranty is asserted against one who is not a party to a contract, the claim must be construed as a tort claim. *See Trgo v. Chrysler Corp., 34 F. Supp. 2d 581, 591 (N.D. Ohio 1998)* ("In Ohio, when a party brings a claim for breach of implied warranty absent privity of contract, the cause of action is one sounding in tort."). Since neither White nor Alvey are signatories to either contract (and the Trustee does not dispute this), the court agrees [*22] with the defendants that the claims for breach of implied warranty must be considered tort claims.

[HN15] Under Ohio law, the economic loss doctrine prevents recovery in tort for purely financial losses. *See Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Ins. Co., 42 Ohio St. 3d 40, 537 N.E.2d 624, 635 (Ohio 1989)* ("In the absence of injury to persons or damage to other property the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence."). Ohio has grouped economic loss into two categories – direct and indirect. Direct economic loss "result[s] from the diminished value of the defective product itself." *See Queen City Terminals, Inc. v. Gen. Am. Transp. Corp., 73 Ohio St. 3d 609, 653 N.E.2d 661, 668 (Ohio 1995)*. Conversely, indirect economic loss comprises lost profits and consequential losses. *653 N.E.2d at 667.*

Nowhere does the Trustee allege that there was diminished value to the allegedly defective White or Alvey products. Rather, the Trustee seeks to recover lost profits and other lost goodwill flowing from the alleged product failures. Thus, the trustee's claim is one [*23] for indirect economic damages. However, [HN16] in Ohio, "in order to recover indirect economic damages in a negligence action, the plaintiff must prove that the indirect economic damages arose from tangible physical injury to persons or from *tangible* property damage." *Id.* (emphasis added). In the present case, the Trustee merely provides a conclusory allegation that there were "losses of inventory." (D.I. 1 at P 37). He does not describe any actual, tangible physical damage to that inventory. *Cf. Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co., 121 Ohio App. 3d 434, 700 N.E.2d 94, 100* (noting that liner attached to defective reactor was damaged). A careful review of the complaint reveals no facts that would allow the court to infer that tangible damage occurred as a result of the defendants' actions. In the absence of any factual allegations regarding tangible property damage, the court finds that there can be no claim for indirect economic loss. Thus, the Ohio economic loss doctrine will bar the Trustee's claim.

2. Count Two – Breach of Contract Against White

The claim for breach of contract against White cannot proceed. The Trustee argues that Foxmeyer was a [*24] third party beneficiary of a contract between White and Buschman. White argues that this claim should be dismissed, *inter alia*, because the complaint fails to assert the specific terms of the contract between White and Buschman that were breached. The court agrees.

Although the Trustee argues otherwise, it is clear that [HN17] Ohio courts require parties to clearly plead the terms of the contract that were allegedly breached. *See Palm Beach Co v. Dun & Bradstreet, 106 Ohio App. 3d 167, 665 N.E.2d 718, 721 (Ohio App. 1995)* (noting that "nowhere in the complaint can there be found any identification by Palm Beach of what express provisions of the contract were allegedly breached"). Count Two of the complaint merely states that "White materially breached its contract with Buschman." (D.I. 1 at P 55.) Assuming that Foxmeyer was a third–party beneficiary of the Buschman–White contract, the Trustee has failed to state the terms of that contract. More important, reading the well-pleaded facts of the complaint in the most liberal fashion possible, the Trustee has not asserted any facts that tend to prove when or how the White–Buschman contract was breached. Thus, the Trustee [*25] has not adequately plead the terms of the contract. The court will, therefore, dismiss this claim. n7

n7 Although it may seem that dismissal at this stage is a harsh penalty, the court does not believe it is. Under similar circumstances, courts have held that dismissal is appropriate. *See Shoreham Hotel Ltd. Partnership v. Wilder, 866 F. Supp. 1, 4 (D.D.C.1994)* (finding failure to state a claim where plaintiff did not plead that defendants were corporate agents as required by applicable contract law); *Picture Lake Campground, Inc. v. Holiday Inns, Inc., 497 F. Supp. 858, 862 (D.Va.1980)* ("The mere references . . . to the breach of various warranties and representations in Paragraph 8 are insufficient to state a breach of the Commitment Agreement. Accordingly, with respect to the Commitment Agreement, First Management has failed to state a claim for which relief can be granted.").

### 3. Count 5 – Fraud

The fraud allegations cannot stand against any defendant. [HN18] In Ohio, in order to [*26] prove fraud, the plaintiff must demonstrate that there was : "(1) a misrepresentation; (2) of a material fact; (3) made with knowledge of its falsity, or reckless disregard for its truth or falsity; (4) upon which the plaintiff justifiably relied; and (5) a resulting injury proximately caused by the reliance." *Rubin v. Schottenstein, Zox & Dunn, 119 F. Supp. 2d 787, 790 (S.D.Ohio 2000).* Similarly, [HN19] in Wisconsin, the plaintiff must prove "(1) false representation; (2) intent to defraud; (3) reliance upon the false representation; and (4) damages." *Mackenzie v. Miller Brewing Co., 2001 WI 23, 623 N.W.2d 739, 745, 241 Wis. 2d 700 (Wis. 2001).*

Two common elements of fraud in Ohio and Wisconsin are that the statement be false and be made with the intent to defraud. The Trustee cannot meet either of these elements. First, the Trustee has provided only conclusory statements regarding the intent to defraud. The complaint is devoid of any specific facts on this issue. [HN20] *Rule 9(b) of the Federal Rules of Civil Procedure* dictates that plaintiffs must plead fraud with specificity. *See FED. R. CIV. P. 9(b).* The Trustee's failure to allege specific facts alone [*27] would be enough to permit the court to dismiss the claim. However, the Trustee has not just failed to provide specific facts regarding intent – he has failed to provide *any* facts on this point. If the court saw even one factual allegation in the complaint from which it could be inferred that the defendants intended to defraud Foxmeyer, it might permit the Trustee to amend his complaint on this issue. The Trustee, however, provides absolutely no facts in his complaint or any of the pleadings that would permit the court to find that any of the defendants acted with scienter. On the current record, then, the court cannot find that the Trustee has adequately

plead that the defendants acted intentionally.

Moreover, even if the Trustee had plead the facts with specificity, the allegedly fraudulent statements are not false in any actionable sense. First, the statements regarding the quality of the products and the expertise of the staff do not constitute fraud. Statements such as "best," "finest," "seamless," and the like are clearly puffery. *See All-Tech Telecom v. Amway Corp., 174 F.3d 862, 868 (7th Cir. 1999)* (defendant's statement that its product was "the best" [*28] was "pure puffery"); *Tibbs v. National Homes Const. Corp., 52 Ohio App. 2d 281, 369 N.E.2d 1218, 1224 (Ohio Ct. App. 1977)* (noting statement that lumber was of "highest quality" was puffery, not actionable fraud). More important, the Trustee has not alleged sufficient facts to demonstrate that the representations the Pinnacle Companies provided about their past performance (e.g. the ability to process 135,000 inventory lines per night, their experience working together) were false. Indeed, many, if not most, of the Pinnacle Companies' claims of past performance appear to be true. No where does the Trustee state that the Pinnacle Companies had not saved their customers money or had never processed 135,000 lines per night. Although the court is slightly more troubled by the Trustee's allegation that the Pinnacle Companies had not previously worked on a project of this type, the complaint reveals that the companies stated that they had worked on "large-scale" projects previously. (D.I. 1 at P 32.) Therefore, the court cannot find that the alleged misrepresentations were false.

Since the court cannot find that the Pinnacle Companies' underlying statements were false, [*29] the Trustee's only remaining argument is that the defendants failed to measure up to their claims. In other words, the Trustee contends that they did not do for Foxmeyer what they apparently did for their previous clients. However, [HN21] statements regrading expectations and predictions are not actionable fraud unless a party makes a promise knowing that it cannot or will not be kept. *See Schurmann v. Neau, 2001 WI App 4, 624 N.W.2d 157, 161, 240 Wis. 2d 719 (Wis. Ct. App. 2000)* (noting that unfulfilled promises not actionable unless speaker had present intent not to perform when statement was made); *Williams v. Edwards, 129 Ohio App. 3d 116, 717 N.E.2d 368, 374 (Ohio Ct. App. 1998)* (noting same). The Trustee does not allege any facts to support the conclusion that the Pinnacle Companies intended to dishonor their promises regarding their performance. Thus, the fraud claim is not actionable and will be dismissed.

### 4. Counts Six and Seven – Negligence and Negligent Misrepresentation

As noted earlier, the economic loss doctrine will limit recovery in tort for purely economic losses. n8 Since these

are tort claims, the Trustee must prove that the losses are [*30] not purely economic. In the present case, as previously stated, the Trustee has failed to prove that there was any tangible, physical damage to property or any other non–economic damages. Thus, the Trustee has failed to overcome the hurdle raised by the economic loss doctrine. Therefore, the negligence claims will be dismissed as to all defendants.

> n8 The earlier discussion focused on Ohio law but Wisconsin law is similar in this regard. *See Ice Bowl v. Weigel Broadcasting Co., 14 F. Supp. 2d 1080, 1082 (E.D. Wis. 1998)* (noting that [HN22] Wisconsin economic loss doctrine does not permit parties to "reallocate contractually bargained for risk" by pleading economic losses in tort); *Wausau Tile, Inc. v. County Concrete Corp., 226 Wis. 2d 235, 593 N.W.2d 445, 452 (Wis. 1999)* (noting that there must be actual "physical harm" to property other than the product to overcome economic loss doctrine).

The Trustee further asserts that although the negligence claims may be disallowed, there is a [*31] growing trend toward permitting negligent misrepresentation claims even in the absence of property damage. n9 Assuming this is true, the Trustee still cannot prevail. [HN23] In both Ohio and Wisconsin, in order to prevail in a negligent misrepresentation claim, the statements at issue must be false. *See Martin v. Ohio State University Foundation, 139 Ohio App. 3d 89, 742 N.E.2d 1198, 1209 (Ohio Ct. App. 2000)* (noting that second element of claim for negligent misrepresentation is that the defendant "supplied false information for the guidance of others in their business"); *Ramsden v. Farm Credit Services of North Cent. Wisconsin, 223 Wis. 2d 704, 590 N.W.2d 1, 8 (Wis. Ct. App. 1998)* (noting that second element of negligent misrepresentation is that defendant's statement "was untrue"). However, as previously noted, the statements made by the defendants were not false in any actionable sense. Thus, even if the economic loss doctrine does not bar recovery, the Trustee cannot prove an essential element of the negligent misrepresentation claim. Therefore, this claim will also be dismissed.

> n9 *See, e.g., Budgetel Inns, Inc. v. Micros Systems, 34 F. Supp. 2d 720, 724–25 (E.D. Wis. 1998); McCarthy, Lebit, Crystal & Haiman v. First Union, 87 Ohio App. 3d 613, 622 N.E.2d 1093, 1106 (Ohio Ct. App. 1993).*

[*32]

5. Count Eight – Promissory Estoppel

[HN24] Under Ohio and Wisconsin law, a valid contract is a bar to a promissory estoppel claim. *See Kashif v. Central State University, 133 Ohio App. 3d 678, 729 N.E.2d 787, 791 (Ohio Ct. App. 1999)* (noting that promissory estoppel cannot be asserted where there is binding, unambiguous contract); *Kramer v. Alpine Valley Resort, 108 Wis. 2d 417, 321 N.W.2d 293, 297(Wis. 1982)* ("Generally, we agree with the proposition that the existence of a contractual relationship will bar a claim based on promissory estoppel."). Both Buschman and McHugh had valid contracts with Foxmeyer. Neither Wisconsin nor Ohio permit promissory estoppel claims under these circumstances. The claims against McHugh and Buschman must, therefore, be dismissed. n10

> n10 The court notes that the Trustee asserts that, as to McHugh, this case fits into the exception outlined by the *Kramer* court. In *Kramer*, the court noted that [HN25] promissory estoppel claims could be viable "where the contract fails to address the essential elements of the parties' total business relationship." The court interprets this language to mean that the exception applies where the promises allegedly relied on by the parties do not make it into the contract. However, the Trustee does not allege which *pre-contract* representations did not make it into the McHugh contract. In other words, the Trustee does not dispute that the McHugh contract represented the entire agreement of the parties. (In fact, there is an integration clause in the contract that declares otherwise.) The court therefore rejects his argument. (The court further rejects any argument that the integration clause was procured by fraud, for reasons previously discussed.)

[*33]

The promissory estoppel claims against White and Pinnacle, however, are viable. The defendants assert that the Trustee's claims arise out of a sale of goods to Foxmeyer, and that those claims must arise from a written contract. White and Pinnacle further assert that since neither party had a contract with Foxmeyer, the statute of frauds will bar the Trustee's claim. The court disagrees. [HN26] The statute of frauds requires a party to provide some proof that a contract exists. *See OHIO REV. CODE ANN. § 1302.04.* However, the court has not found – and the parties have not provided – any authority for the proposition that a contract is a prerequisite to a promissory estoppel claim. Indeed, quite the opposite is true. As the cases cited above indicate, promissory estoppel is most appropriate where there is *no* contract. *See Kashif, 729 N.E.2d at 791; Kramer, 108 Wis. 2d 417, 321 N.W.2d*

*293 at 297.* [HN27] If the statute of frauds requires proof of a contract but no contract is required for a promissory estoppel claim, the statute of frauds is an inadequate defense to that claim. Here, with respect to White and Pinnacle, there was no contract. Thus, the statute [*34] of frauds is an inadequate defense. Therefore, the claims against White and Pinnacle will be allowed to proceed.

### 9. Dismissal of the Non-Involved Plaintiffs

The defendants assert that the non-involved plaintiffs (Healthcare Transportation Systems, Inc., Merchandise Coordinator Services Corporation, Foxmeyer Software, Inc., and Health Mart, Inc.) were not involved in any of the events that give rise to this claim. Thus, the defendants argue the Trustee has failed to state a claim with respect to these plaintiffs. The court agrees. The complaint focuses solely on the relationship between Foxmeyer and the Pinnacle Companies. At no point does the complaint disclose that any of these plaintiffs were privy to the alleged contracts, misrepresentations, or other activities that gave rise to this action. Thus, each of these non-involved plaintiffs has failed to state a claim for which relief can be granted. Therefore, each of the above mentioned plaintiffs will be dismissed from this litigation.

## V. CONCLUSION

For all of the foregoing reasons, the court will grant the defendants' motions to dismiss in part and will deny them in part. Counts Two, Four, Five, Six, and Seven are dismissed. [*35] Counts One and Three will be allowed to proceed only against McHugh and Buschman. Moreover, Counts One and Three against McHugh can only proceed on the best efforts issue, and any recovery will be limited to the fees paid to McHugh. Count Eight is dismissed as to McHugh and Buschman, but the promissory estoppel claims against White and Pinnacle will proceed. Finally, all non-involved plaintiffs will be dismissed from this action, and the caption shall be revised accordingly.

For the foregoing reasons, IT IS HEREBY ORDERED THAT:

1. The Motion to Dismiss of Buschman, et al. (D.I. 24) is GRANTED as to Counts Two, Four, Five, Six and Seven. The motion is GRANTED as to Count Eight for the defendant Buschman. It is DENIED as to Count Eight for defendants White and Pinnacle.

2. The defendant McHugh's Motion to Dismiss (D.I. 17) is GRANTED as to Counts Three (as to implied warranties only); Four, Five, Six, Seven, and Eight. The motion is DENIED as to Counts One and Three (for express warranty to use best efforts only).

3. The Plaintiff will be permitted to amend his complaint as to the issues of notice and best efforts as they relate to Counts One and Three.

4. [*36] The defendants' request to dismiss the non-involved plaintiffs (Healthcare Transportation Systems, Inc., Merchandise Coordinator Services Corporation, Foxmeyer Software, Inc., and Health Mart, Inc.) is GRANTED.

5. Plaintiffs Healthcare Transportation Systems, Inc., Merchandise Coordinator Services Corporation, Foxmeyer Software, Inc., and Health Mart, Inc. shall be terminated as plaintiffs and the caption revised accordingly.

6. Buschman's Motion to Extend Time to Answer or to Stay (D.I. 22) is DISMISSED as MOOT.

Dated: March 12, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 2003 DEL. CH. LEXIS 118

**CANDLEWOOD TIMBER GROUP LLC and FORESTAL SANTA BARBARA SRL,
Plaintiffs, v. PAN AMERICAN ENERGY LLC, Defendant.**

**C.A. No. 20135–NC**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2003 Del. Ch. LEXIS 118*

**September 29, 2003, Submitted
October 22, 2003, Decided
October 22, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed in part and reversed in part by, Remanded by *Candlewood Timber Group, LLC v. Pan Am. Energy, LLC, 2004 Del. LEXIS 458 (Del., Oct. 4, 2004)*

**DISPOSITION:** [*1] Plaintiffs' claims dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff wood product sellers filed an action against defendant oil and gas extractors, alleging breach of contract, negligence, fraud, tortious infringement of property rights, and tortious interference with business relations. The court considered the issues of subject matter jurisdiction and forum non conveniens.

**OVERVIEW:** The sellers owned land in the Argentine Province of Salta, wherein they extracted wood. The extractors were granted the right by the Argentine Republic to remove oil and gas from property in Salta, including the sellers' land. The sellers brought an action based on alleged damage to their land, which included an equitable prayer for specific performance, seeking to have the extractors obtain the necessary insurance coverage. The court found that the complaint failed to invoke the equitable jurisdiction of the court, as there was an adequate monetary remedy at law. Accordingly, dismissal was required due to lack of subject matter jurisdiction. The court dismissed the complaint on the alternative basis that Delaware was not the appropriate forum for the dispute to be litigated, based on an evaluation of the six Cyro–Maid factors. The court found that the dispute involved land located in Argentina; Argentina law probably controlled; the contracts were negotiated, executed, and breached there; the witnesses and discovery were more convenient to that forum, and there was already litigation pending there; and Delaware had little or no interest in

the resolution of the dispute.

**OUTCOME:** The court dismissed the sellers' claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Remedies > Damages > Monetary Damages*
*Contracts Law > Remedies > Compensatory Damages > General Overview*
[HN1] By common-law tradition and statute, the Court of Chancery of Delaware does not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of Delaware. *Del. Code Ann. tit. 10, § 342.* A legal remedy, i.e., money damages, is "sufficient" if it is "complete, practical, and efficient."

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN2] Judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of the court regardless of whether the issue has been raised by the parties. Del. Ch. Ct. R. 12(h)(3) provides that whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the matter.

*Civil Procedure > Equity > General Overview*
[HN3] Equitable jurisdiction must be determined from the face of a complaint as of the time of filing, with all material factual allegations viewed as true. But the Court

2003 Del. Ch. LEXIS 118, *1

of Chancery of Delaware will go behind the "facade of prayers" to determine the "true reason" for which a plaintiff brought suit. The applicable jurisdictional analysis is a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate.

*Civil Procedure > Equity > General Overview*
*Contracts Law > Remedies > Specific Performance*
[HN4] Where a complaint sets out no basis at all for establishing equity jurisdiction other than a kind of formulaic "open sesame" by the use of the words "specific performance," such an "incantation of magic words" is insufficient to confer equity jurisdiction.

*Civil Procedure > Venue > Forum Non Conveniens*
[HN5] A complaint is dismissed on forum non conveniens grounds when a defendant demonstrates that litigating in Delaware would impose on it an "overwhelming hardship." In determining whether a defendant has demonstrated an overwhelming hardship, a court considers the six Cyro–Maid factors. The six factors are:  (1) ease of access to proof; (2) availability of compulsory process for witnesses; (3) possibility of the view of the premises; (4) whether the controversy is dependent upon application of Delaware law; (5) the pendency of a similar action in another jurisdiction; and (6) other practical problems.

*Civil Procedure > Venue > Forum Non Conveniens*
[HN6] In a dismissal on forum non conveniens grounds, a defendant must show "with particularity" that one or more of the Cyro–Maid factors, individually or together, imposes an "overwhelming hardship." The Delaware Supreme Court's reference to "particularity" has established that bare allegations of inconvenience without an adequate showing of particulars of the hardships will not suffice. Furthermore, the Delaware Supreme Court has held that it does not matter whether only one of the Cyro–Maid factors favors defendant or all of them do because whether an alternative forum would be more convenient for the litigation, or perhaps a better location, is irrelevant.

*Civil Procedure > Venue > Forum Non Conveniens*
[HN7] The first two Cyro–Maid factors in determining a forum non conveniens issue involve similar considerations and essentially seek to ascertain whether a defendant's ability to establish its defense is significantly impaired by litigating in Delaware. This analysis requires a consideration of what defenses the defendant proposes to rely on and an identification of specific pieces of evidence or witnesses necessary to its defense that it will not be able to produce in Delaware.

*Governments > Courts > Authority to Adjudicate*

*International Law > Dispute Resolution > Evidence > Assistance*
*International Law > Dispute Resolution > Service of Process*
[HN8] Argentina is a signatory of the Hague Convention on Taking of Evidence Abroad in Civil and Commercial Matters. 28 U.S.C.S. § 1781. The Delaware Supreme Court has recognized that use of the Hague Convention's procedures for securing evidence is cumbersome. Under the Convention's procedures, a Delaware court may issue a "Letter of Request" directed at the Argentine Ministry of Foreign Relations and Culture to obtain evidence. The Ministry of Foreign Relations and Culture then transmits the letter to a judicial authority competent to execute the request. Notably, however, Argentina included as a reservation to its accession to the Convention the following language:  The Argentine Republic will not execute Letters of Request issued for the purpose of obtaining pretrial discovery of documents as known in the common law countries.

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > State Immunity*
*International Law > Immunity > General Overview*
[HN9] The Court of Chancery of Delaware is limited in its exercise over foreign governments by the Foreign Sovereign Immunities Act of 1976, 28 U.S.C.S. §§ 1330, 1332(a), 1391(f), and 1601–1611.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*
[HN10] A court may dismiss an action where the parties have consented to have their dispute resolved in another forum.

**COUNSEL:** Joel Friedlander, of BOUCHARD MARGULES & FRIEDLANDER, Wilmington, Delaware, Attorneys for Plaintiffs.

Thomas R. Hunt, Jr., David J. Teklits and Thomas W. Briggs, Jr., of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, Attorneys for Defendant.

**JUDGES:** CHANDLER, Chancellor.

**OPINIONBY:** CHANDLER

**OPINION:**

    **MEMORANDUM OPINION**

CHANDLER, Chancellor

## I. BACKGROUND

Plaintiff Candlewood Timber Group LLC ("Candlewood") is a Delaware limited liability company that formed an Argentine subsidiary, Forestal Santa Barbara SRL ("FSB"), which purchased approximately 250,000 acres of land in the Argentine Province of Salta. Candlewood and FSB are in the business of selling wood products derived from forests managed in an environmentally friendly manner. Candlewood and FSB allege that their business depends on the ability to obtain certification from an internationally recognized forestry organization that FSB's lands are managed sustainably. Defendant Pan American Energy L.L.C. ("Pan American") is a Delaware limited liability company that engages [*2] in oil and gas extraction. n1 Pan American is the majority owner and operator of a consortium of companies that were granted concessionary rights by the Argentine Republic, the owner of all oil and gas rights in Argentina, to extract oil and gas in the Province of Salta, including lands owned by FSB.

> n1 Pan American operates in Argentina through a "branch," that is similar to a wholly-owned subsidiary.

Pan American has the right to extract oil and gas underneath FSB's land and sought permission from FSB to enter its land for this purpose. FSB, at Candlewood's direction, issued two permits for Pan American to enter FSB's land. These permits obligated Pan American to purchase comprehensive liability insurance, to hold harmless FSB from any claims by third parties, and indemnify FSB for any damage caused to "properties or any other assets (moveable or real estate) owned by FSB whether the damage is produced directly or indirectly by any employee or person or company contracted by Pan American, with obligation to [*3] repair or replace the asset damaged at the choice of FSB, immediately." n2

> n2 Second Am. Compl. P24. Plaintiffs also allege that there was accompanying correspondence and oral communications wherein the issuance of the permits in which plaintiffs explained to Pan American their sustainable forestry plans and the need to obtain third-party certification. It is also alleged that in these communications Pan American agreed to limit its impact to the land, conduct environmental impact assessments, and engage in certain environmental remediation activities. *See* Second Am. Compl. PP21–27.

Pan American initialed one of the permits and proceeded to enter FSB's land to perform oil and gas exploration and extraction. Candlewood and FSB allege that Pan American operations inflicted significant damage on the property. They also allege that this damage has prevented the plaintiffs from having their forest products certified as coming from sustainable sources.

Plaintiffs allege five counts in their Second Amended Complaint: [*4] (1) Breach of Contract; (2) Negligence; (3) Fraud; (4) Tortious Infringement of Property Rights; and (5) Tortious Interference with Business Relations. The contract claim alleges that Pan American breached its obligations under the permits and accompanying correspondence and that "Candlewood and FSB are entitled to indemnification for their losses, and specific performance to compel Pan American to purchase comprehensive liability insurance, as Pan American committed to do." n3 The prayer for relief seeks an "order compelling Pan American to obtain and maintain in effect sufficient casualty, liability and fire insurance policies to protect FSB against any loss of value to the Candlewood Forest Property from casualty, including, without limitation, forest fire, and any liability and injury to employees, agents, contractors or other representatives of Plaintiffs, and to include Plaintiffs as named insureds of such policies." n4 This request for specific performance is the only reference in the complaint to an equitable remedy.

> n3 Second Am. Compl. P45.

> n4 Second Am. Compl. P(A).

[*5]

## II. ANALYSIS

The plaintiffs' complaint is dismissed on two independent and alternative grounds. First, the complaint fails to invoke this Court's equity jurisdiction. Second, Delaware is not the proper forum for this dispute.

### A. Equity Jurisdiction

[HN1] By common-law tradition and statute, this Court does "not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." n5 A legal remedy, *i.e.*, money damages, is "sufficient" if it is "complete, practical, and efficient." n6 As applied to this action, if money damages are a sufficient remedy to Pan American's alleged breach of contract, I will dismiss the complaint for lack of jurisdiction. n7

> n5 *10 Del. C. § 342.*

> n6 *In re Wife, K., 297 A.2d 424 (Del. Ch. 1972).*

> n7 None of the plaintiffs' five claims implicate

matters over which this Court has jurisdiction pursuant to *10 Del. C. § 341, e.g.,* a claim for breach of fiduciary duty. If jurisdiction exists, it only exists because there is no adequate remedy at law. The parties did not brief this issue directly, but "it is clear that, unlike many jurisdictions, [HN2] judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties." *IBM Corp. v. Comdisco, Inc., 602 A.2d 74, 77 n.5 (Del. Ch. 1991). See also Glanding v. Industrial Trust Co., 28 Del. Ch. 499, 45 A.2d 553, 554 (Del. 1945)* (issue of equitable jurisdiction was raised on appeal "not by the parties but by the Court itself"); Del. Ch. Ct. R. 12(h)(3) ("whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the Court shall dismiss the matter").

**[*6]**

[HN3] "Equitable jurisdiction must be determined from the face of the complaint as of the time of filing, with all material factual allegations viewed as true." n8 But this Court will go behind the "facade of prayers" to determine the "true reason" for which Candlewood and FSB brought suit. n9 Then–Chancellor Allen described the applicable jurisdictional analysis as "a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate." n10

> n8 *IBM Corp. v. Comdisco, Inc., 602 A.2d 74, 78 (Del. Ch. 1991).*
>
> n9 *Id.*
>
> n10 *McMahon v. New Castle Assocs., 532 A.2d 601, 603 (Del. Ch. 1987).*

I should note at the outset that the plaintiffs' complaint does not allege that there is an inadequate remedy at law. There is no allegation that a multiplicity of suits at common law will be required to cure the asserted wrong with finality. There is no allegation that Pan American is insolvent or otherwise **[*7]** in such dire financial straits that execution on a money judgment would fail. It does not appear from the face of the complaint that a trier of fact would be unable to quantify the damages arising from the alleged breach of contract. And there is no allegation that the subject matter of the action is unique or of some special value to Candlewood and FSB that defies valuation. In short, [HN4] the complaint sets out no basis at all for establishing equity jurisdiction other than "a kind

of formulaic 'open sesame'" n11 by the use of the words "specific performance." Such an "incantation of magic words" is insufficient. n12

> n11 *IBM Corp., 602 A.2d at 78.*
>
> n12 *McMahon, 532 A.2d at 603.* In fact, looking at the complaint as a whole, it appears that the request for specific performance is a disingenuous jurisdictional hook and that plaintiffs truly seek money damages. But for my conclusion that Delaware is an inconvenient forum, this matter would be transferred to the Superior Court pursuant to *10 Del. C. § 1902.*

**[*8]**

Even if the plaintiffs had alleged that they had an inadequate remedy at law, a realistic assessment of whether money damages are sufficient to remedy the alleged breach of contract demonstrates that such an allegation would be a facade. The plaintiffs seek to require Pan American to purchase an insurance policy covering damage to their property, damage that has already been inflicted by Pan American's actions. Even if Pan American had such an insurance policy, it would presumably direct monetary payment to the plaintiffs if damage was done to the property—monetary payment that plaintiffs can recover as damages without resort to the extraordinary remedy of specific performance. In fact, the complaint itself demonstrates that there is an adequate remedy at law: the complaint seeks money damages for those harms that would have been covered by the insurance policy that Pan American allegedly never purchased. Because plaintiffs can adequately seek monetary damages in a court of law for Pan American's alleged breach of contract, this Court can not grant specific performance and, hence, does not have jurisdiction to hear and decide this matter. n13

> n13 *See, e.g., Theis v. Board of Education, 2000 Del. Ch. LEXIS 48 (Del. Ch.)* (dismissing for lack of jurisdiction where adequate remedy at law existed for breach of contract claim); *Manchester v. Narragansett Capital, Inc., 1989 Del. Ch. LEXIS 141 (Del. Ch.)* (finding specific performance an unnecessary remedy where money damages are adequate).

**[*9]**

**B. Forum Non Conveniens**

[HN5] A complaint is dismissed on *forum non conveniens* grounds when a defendant demonstrates that litigating in Delaware would impose on it an "overwhelming hardship." n14 In determining whether Pan American has

demonstrated an overwhelming hardship, this Court considers the six *Cyro-Maid* factors. n15 The six factors are: (1) ease of access to proof; (2) availability of compulsory process for witnesses; (3) possibility of the view of the premises; (4) whether the controversy is dependent upon application of Delaware law; (5) the pendency of a similar action in another jurisdiction; and (6) other practical problems. n16

> n14 *Mar-Land Industrial Contractors, Inc. v. Caribbean Petroleum Refining, L.P.,* 777 A.2d 774 (Del. 2001); *Warburg, Pincus Ventures, L.P. v. Dietrich K.H. Schrapper, M.D.,* 774 A.2d 264 (Del. 2001).

> n15 *Mar-Land,* 777 A.2d at 778.

> n16 *Id.* (citing *Ison v. DuPont de Nemours,* 729 A.2d 832 (Del. 1999); *General Foods Corp. v. Cyro-Maid, Inc.,* 41 Del. Ch. 474, 198 A.2d 681 (Del. 1964)).

[*10]

[HN6] Pan American "must show 'with particularity' that one or more of these factors, individually or together, imposes an 'overwhelming hardship.'" n17 The Supreme Court's reference to "particularity" has established that "bare allegations of inconvenience without an adequate showing of particulars of the hardships" will not suffice. n18 Furthermore, the Supreme Court has held that "it does not matter whether only one of the *Cyro-Maid* factors *favors* defendant or all of them do" n19 because "whether an alternative forum would be more convenient for the litigation, or perhaps a better location, is irrelevant." n20 The issue is not whether Pan American has shown that Argentina is a better forum for the litigation, but whether Pan American has shown with particularity, through one or more of the *Cyro-Maid* factors, that litigating in Delaware constitutes an overwhelming hardship.

> n17 *Id.* (citing *Ison,* 729 A.2d at 838; *Williams Gas Supply Co. v. Apache Corp.,* 594 A.2d 34, 36 (Del. 1991). *See also Warburg,* 774 A.2d at 271 ("through the combination and weight of any or all of the . . . factors").

[*11]

> n18 *Id.* 777 A.2d at 780.

> n19 *Chrysler First Business Credit Corp. v. 1500 Locust Ltd. Partnership,* 669 A.2d 104 at 108 (emphasis added).

> n20 *Mar-Land,* 777 A.2d at 779.

**Access to Proof and Compulsory Process for Witnesses.** [HN7] The first two factors involve similar considerations and essentially seek to ascertain whether Pan American's ability to establish its defense is significantly impaired by litigating in Delaware. This analysis requires a consideration of what defenses Pan American proposes to rely on and an identification of "specific pieces of evidence [or witnesses] necessary to its defense that it will not be able to produce in Delaware." n21

> n21 *Id.* at 781.

Although Pan American has not filed an answer in this case, it is clear that Pan American intends to contest that it damaged FSB's land to the extent alleged and that the witnesses, physical evidence, and documents related to this defense are located in a [*12] remote area of Argentina. Travel to and from this location for litigation in Delaware is extremely inconvenient. The travel time is of a magnitude considerably greater than that found not to work an overwhelming hardship in *Warburg.* n22 Moreover, the five employees most knowledgeable of Pan American's activities in Argentina live, unsurprisingly, in Argentina and speak minimal English. n23 These employees are also critical to normal business operations and Pan American's business will suffer significant disruption if they must travel to Delaware for trial. Furthermore, all of the documents relating to this case are in active use in Argentina and virtually all of the documents are in Spanish. Securing live testimony of these witnesses and producing English translations of the relevant documents in Delaware will entail substantial burdens to Pan American. Practically, in order to litigate in Delaware, Pan American may suffer the deprivation of live testimony and, resultantly, may have difficulty presenting rebuttal testimony.

> n22 *Warburg* involved travel to and from major metropolitan areas in Germany and England, 774 A.2d at 270.

[*13]

> n23 The facts regarding the location and access to witnesses and evidence were established through the affidavit of Fernando Villarreal, Gas Operations Vice President at Pan American.

Additionally, this Court may have limited powers to compel access to witnesses and documents, at least at a pre-trial stage. [HN8] Argentina is a signatory of the Hague Convention on Taking of Evidence Abroad in Civil

and Commercial Matters. n24 The Supreme Court has recognized that use of the Hague Convention's procedures for securing evidence is cumbersome. n25 Under the Convention's procedures, this Court may issue a "Letter of Request" directed at the Argentine Ministry of Foreign Relations and Culture to obtain evidence. The Ministry of Foreign Relations and Culture then transmits the letter to a judicial authority competent to execute the request. Notably, however, Argentina included as a reservation to its accession to the Convention the following language: "The Argentine Republic will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in the common law [*14] countries." n26 As a result of Argentina's reservation to the Hague Convention, Pan American may have no pre-trial discovery.

 n24 *Opened for signature* March 18, 1970, 23 U.S.T. 2555, *28 U.S.C. § 1781.*

 n25 *Ison, 729 A.2d at 843.*

 n26 *See* Hague Conference on Private International Law, *Full Status Report Convention # 20* (Aug. 21, 2003), *at* http://www.hcch.net/e/status/stat20e.html.

**View of the Premises.** As noted, the essential damages issue in this case is whether Pan American caused harm to FSB's land. Plaintiffs' central allegation is that "Pan American has engaged in mammoth excavation activities on FSB's property that have inflicted and continue to inflict widespread, unremediated damage." n27 The case will undoubtedly contain dueling expert opinions on the scope of the alleged damage. Pan American asserts that this factual dispute cannot come to resolution without a view of the premises and, therefore, it will suffer overwhelming [*15] hardship if forced to litigate here. Delaware cases that have considered this factor have concluded that, to the extent that a view of the premises is necessary, video is a reasonable substitute. n28 None of these cases, however, involved complex factual disputes related to injury done to real property; the need to view the premises, in my opinion, is greater in the instant case. Video is a substitute, but it is only that—a substitute. Pan American will clearly suffer difficulties if forced to litigate in Delaware because the finder of fact cannot view the premises. n29

 n27 Second Am. Compl. P4. The plaintiffs allege that this damage has resulted in "degradation of the environment and biodiversity" of FSB's land through "fragmentation of habitats," "creation of access corridors that facilitated the illegal intrusion

of hunters and cattle," and "invasion of exotic . . . species." *Id. at P37.*

 n28 *See Ison v. E.I. Dupont De Nemours & Co., 729 A.2d 832, 837 (Del. 1999); Texas Instruments v. Cyrix Corp., 1994 Del. Ch. LEXIS 31, 18–19 (Del. Ch.); Sequa Corp. v. Aetna Casualty & Surety Co., 1990 Del. Super. LEXIS 303 (Del. Super.). But see McDonald's Corp. v. Bukele, 960 F. Supp. 1311, 1319 (U.S. Dist. 1997)* ("a view of the premises may be necessary"); *Miller v. Phillips Petroleum Co., 529 A.2d 263, 270 (Del. Super. 1987)* ("to the extent it is necessary . . . it is more easily done by the [foreign court]"); *Moffitt v. Illinois Power Co., 248 Ill. App. 3d 752, 761, 188 Ill. Dec. 735, 618 N.E.2d 1305 (Ill. App. 1993)* ("if a view of the premises were necessary it would be more convenient" to travel from the foreign court).

[*16]

 n29 In *Woodlands Cemetery Co. v. United States, 110 F. Supp. 704, 706 (E.D. Pa. 1953),* the court found that in a takings case "the jury were in a much better position to properly evaluate the property after having seen it with its own surroundings" and "in view of the great disparity in the testimony of the two sets of experts as to the value of the land, that the jury would have been in no position to properly evaluate the estimates of the experts without personally viewing the land, its location and surroundings . . . ."

**Delaware's Interest in the Litigation.** Delaware's interest in a dispute regarding injury to land located in Argentina is minimal, especially since the conduct alleged to have caused that injury occurred in Argentina. A preliminary analysis of the relevant choice of law principles indicates that Argentine law will almost certainly govern this dispute. n30 Although Delaware courts "wrestle" with open questions of the law of foreign countries on occasion, n31 this case presents a unique combination of circumstances that warrants a careful and thorough examination [*17] of this factor.

 n30 Delaware has adopted the Restatement approach to resolving choice of law issues. *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc., 394 A.2d 1160 (Del. 1978).* The Restatement establishes the broad principle that rights and liabilities with respect to the particular issue are determined by the local law of the State that, as to that issue, has "the most significant relationship" to the occurrence and the parties. In this case, Argentina has

the most significant relationship to the dispute and the parties: the land is located in Argentina, the relevant conduct occurred in Argentina, and two parties are Argentine companies. *See* Restatement (Second) of *Conflict of Laws § 147.* Plaintiffs' contract claim is also governed by Argentine law. The place of contracting, negotiation, and performance was Argentina. The subject matter of the contract is located in Argentina. And again two parties are Argentine companies. *See* Restatement (Second) of *Conflict of Laws § 188.* The preceding concerns are amplified in this case since the contract concerns interests in land located in Argentina. *See* Restatement (Second) of *Conflict of Laws § 189.*

**[*18]**

n31 *See Taylor v. LSI Logic Corp., 689 A.2d 1196, 1120 (Del. 1997).*

The heart of this case involves a land use dispute arising under the laws of Argentina. Delaware has a very limited interest in this litigation, but Argentina's interest in this litigation is substantial. In fact, Pan American has argued that Argentine courts have exclusive jurisdiction to resolve the issues in this case because the resolution of this litigation will implicate Argentina's interests in the oil and gas that Pan American was seeking to extract from FSB's land. n32 Pan American filed a petition on March 5, 2003, in the Supreme Court of Argentina, seeking a declaration that this dispute is subject to the exclusive jurisdiction of Argentine courts. The Argentine Attorney General issued an opinion concerning Pan American's petition, in which the Attorney General opined that Argentine courts should have exclusive jurisdiction over any dispute concerning Pan American's operations on FSB's land under the concessionary rights provided by Argentina to Pan American. n33 Based on the Attorney General's opinion, **[*19]** the Supreme Court of Argentina ordered service on all defendants, including the Nation of Argentina and the Province of Salta. On July 11, 2003, the Province of Salta entered an appearance in the Argentine Supreme Court and asserted that the Argentine courts are the proper forum for this dispute. On September 12, 2003, the Nation of Argentina also entered its appearance, stated that it had a direct interest in the outcome of the dispute, and reiterated the Province of Salta's assertion that the Argentine courts are the only appropriate forum.

n32 As noted above, all oil and gas in Argentina is owned by the national government and the right to extract oil and gas is granted to private parties like Pan American. The right to extract the oil and gas is accompanied by an easement to access any land under which the oil and gas is located. The Nation of Argentina and the Province of Salta derive significant revenues from Pan American's extraction of oil and gas reserves. Aff. of Francisco J. Romano, Ex. 2 (op. of Argentine Att'y Gen.); Aff. of Haracio A. Grigera Naon, PP47–53; Aff. of Edmundo F. Catalano, PP3–5.

**[*20]**

n33 Aff. of Francisco J. Romano, Ex. 2.

Argentina, as owner of all oil and gas resources in Argentina, has a bona fide interest in any compensation paid to FSB due to damage allegedly caused by Pan American's operations pursuant to extraction rights granted to it by Argentina. This interest is not speculative, and is evidenced by the Nation of Argentina and Province of Salta's submissions before the Supreme Court of Argentina. A decision in this action will likely implicate Argentina's right to regulate access to surface property that lies above government owned oil and gas fields. Furthermore, a decision will implicate Argentina's economic interests because a decision adverse to Pan American may reduce the revenues Argentina derives from Pan American's extraction activities. Because of the significant interests of Argentine governmental entities, the Argentine courts may have *exclusive* jurisdiction over this dispute. n34 This exclusive jurisdiction may independently deprive this Court of its jurisdiction. n35 Regardless, Argentina's significant interest in this litigation, and Delaware's **[*21]** limited interest in this litigation, counsels judicial discretion strongly in favor of dismissal. n36

n34 Although the resolution of this issue is pending before the Argentine Supreme Court, it appears that under Articles 116 and 117 of the Argentine Constitution a dispute where the Nation of Argentina and a province thereof are interested parties requires resolution in an Argentine court, not a foreign country.

n35 *See Taylor v. LSI Logic Corp., 715 A.2d 837 (Del. 1998)* (dismissing complaint where foreign country recognized exclusive jurisdiction over subject of dispute).

n36 *See IM2 Merchandising & Mfg., Inc. v. Tirex Corp., 2000 Del. Ch. LEXIS 156, *37 (Del. Ch.)* ("The great weight given to a plaintiffs interest in having novel Delaware law questions, decided in our own courts under the *Cyro-Maid* test suggests

that a defendant's interest in having the courts of the jurisdiction of the governing law decide important legal issues ought also be given some weight") (footnotes omitted). In addition, it is notable that although the complaint sounds in simple breach of contract and negligence language, it is clear that resolution of this dispute will require thorough consideration of Argentine hydrocarbon law and policy, as well as a careful policing of the boundaries between Argentine tort, contract, and real property law. "Modesty and consistency in approach suggest that the evaluation of these issues may best be accomplished by the courts in the jurisdiction of the governing law." *Id. at* \*39.

[*22]

**Other Pending Litigation.** As discussed, there is an action similar to this litigation pending before the Argentine courts. Both parties' legal experts have testified that the Argentine courts are fully capable of resolving disputes of this nature. And the Argentine courts may actually have greater capacity to resolve this dispute since they can exercise jurisdiction over the governmental entities, the Nation of Argentina and the Province of Salta, with an interest in the outcome of this dispute. n37

> n37 [HN9] This Court is limited in its exercise over foreign governments by the Foreign Sovereign Immunities Act of 1976, *28 U.S.C. §§ 1330, 1332(a), 1391(f)*, and 1601-1611.

**Another Practical Problem.** Before Pan American began extensive oil and gas extraction, Pan American conducted preliminary seismic surveying on FSB's land. This preliminary activity apparently caused some damage to FSB's land. Pan American paid FSB for damage caused by the seismic surveying, and in June 2000, George [*23] Brooking, attorney-in-fact for FSB, signed a Receipt for Indemnification Payment that included an exclusive Argentine forum selection clause. n38 Pan American argues that the forum selection clauses contained in the Receipts strip this Court of subject-matter jurisdiction. n39

> n38 FSB signed a similar Receipt, which also contained an exclusive Argentine forum selection clause, in August of 2000.

> n39 [HN10] This Court may dismiss an action where the parties have consented to have their dispute resolved in another forum. *Elf Atochem North America, Inc. v. Jaffari, 727 A.2d 286 (Del. 1999).*

Pan American, however, must establish that the claims alleged in the complaint are governed by the forum selection clauses contained in the Receipts. The Receipts were signed as acknowledgement of monies paid by Pan American to FSB for damage related to the conduct of seismic surveying. The Receipts do not purport to cover Pan American's more intensive activities of establishing an oil well and constructing a road [*24] to that oil well. Plaintiffs argue that those activities are governed by different contracts that do not contain a forum selection clause and that the claims in the Second Amended Complaint only relate to damage from the drilling and road constructing covered by those contracts. n40

> n40 *See supra* n.2 and accompanying text.

Pan American argues, however, that it would be impossible in some circumstances to determine what damage was caused by clearing land to conduct seismic activities, which would be governed by the forum selection clauses, as opposed to damage caused by building an oil well and connecting road. In *In re IBP, Inc. S'holders Litig.*, the Court of Chancery assumed jurisdiction over a dispute that was partially governed by a forum selection clause (specifying the Delaware Court of Chancery) because otherwise no single jurisdiction could hear all of the relevant claims. n41 Similarly, Pan American argues that this Court should decline jurisdiction because only the courts of Argentina can hear [*25] claims for damages arising out of *both* the seismic surveying and oil drilling/road clearing activities. Although I decline to dismiss this action solely because of the forum selection clauses in the Receipts, I note that it will be necessary to delineate clearly the line between the damage caused by the seismic activities and the damage caused by oil and gas extraction during the course of this litigation—a complicated task that could prove unmanageable. Argentine courts would not face this same definitional problem and could hear all issues surrounding Pan American's activities. n42

> n41 *In re IBP S'holders Litig. v. Tyson Foods, Inc., 789 A.2d 14, 2001 WL 406292 (Del. Ch.).*

> n42 Independently, FSB's agreement to an exclusive Argentine forum selection clause evidences a willingness to adjudicate some disputes relating to Pan American's activities in Argentina. This further supports, in my opinion, the appropriateness of Argentine courts as the forum for this dispute. It also undercuts plaintiffs' repeated efforts to disparage the Argentine court system.

[*26]

2003 Del. Ch. LEXIS 118, *26

Taking all of these various factors into consideration and giving each the weight it deserves, I conclude that litigating this dispute in Delaware would constitute an overwhelming hardship to Pan American. Delaware has little or no interest in resolving this dispute. Plaintiffs purchased real estate in Argentina. They formed an Argentine entity to develop the resources located in Argentina. They negotiated and executed contracts in Argentina. The breach of these contracts, and the alleged tortious conduct attendant thereto, all occurred in Argentina. Argentine law will govern this dispute. Finally, Argentine governmental authorities have expressed a direct interest in this controversy. Litigating this matter in Delaware, rather than in Argentina, defies common sense.

### III. CONCLUSION

For the foregoing reasons, the plaintiffs' claims are dismissed based on a lack of subject matter jurisdiction. Alternatively, plaintiffs' claims are dismissed based on *forum non conveniens.*

IT IS SO ORDERED.

LEXSEE 2005 U.S. DIST LEXIS 1726

**M&M TECHNOLOGIES, INC., Plaintiff, v. GURTLER CHEMICALS, INC., Defendant/Third-Party Plaintiff, v. BURLINGTON CHEMICAL CO., INC., Third-Party Defendant.**

**Civil Action No. 03–994 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 1726*

**February 8, 2005, Decided**

**DISPOSITION:** Motion to dismiss for lack of personal jurisdiction was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company filed a patent infringement action against defendant company. Before the court was third–party defendant company's motion to dismiss for lack of personal jurisdiction.

**OVERVIEW:** Defendant argued that third–party defendant's actions were directed at Delaware because it engaged defendant as a nationwide distributor of a product it sold to defendant. There was no evidence in the record that defendant was acting as third–party defendant's distributor of the product. Indeed, defendant purchased the product from third–party defendant, diluted it with water, and sold it under defendant's trademark. Thus, Del. Code Ann. tit. 10, § 3104(c)(1), was not a basis for the exercise of jurisdiction. Defendant also did not make a prima facie showing of personal jurisdiction under § 3104(c)(4). Third–party defendant's sales of products to customers in Delaware in 2001, 2002, and 2003 were about $1,000 each year, representing 0.0007 percent of annual sales revenues. In 2004, it had sales to three customers in Delaware that totaled approximately $20,070. While sales of products to Delaware customers grew in 2004, Delaware revenue only comprised approximately 0.14 percent of its total annual sales. Because the Delaware revenue was less than one percent of total annual revenue, it was not substantial enough to warrant an exercise of general jurisdiction.

**OUTCOME:** The motion to dismiss was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] Fed. R. Civ. P. 12(b)(2) requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN2] In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long–arm statute of the state in which the court sits. If jurisdiction is proper per the long–arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. To satisfy the second prong of this analysis, the court must find the existence of minimum contacts between the defendant and the forum state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Specifically, the plaintiff must show that the defendant purposefully availed itself of the privilege of conducting activities within the forum state. Unless the contacts are continuous and systematic, they must be related to the present cause of action.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] In determining the jurisdictional question, the court must accept as true the allegations in the complaint,

2005 U.S. Dist. LEXIS 1726, *

but the plaintiff bears the burden of alleging facts sufficient to make a prima facie showing of personal jurisdiction over the defendant. To meet this burden, the plaintiff must adduce facts which establish with reasonable particularity that jurisdiction over the defendant exists.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN4] Under Del. Code Ann. tit. 10, § 3104(c)(1), the court may exercise jurisdiction over a nonresident who transacts any business or performs any character of work or service in the state.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN5] Delaware courts construe the Del. Code Ann. tit. 10, § 3104, broadly to confer jurisdiction to the maximum extent possible so as to provide residents a means of redress against those not subject to personal service within the state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
*Contracts Law > Sales of Goods > Title, Creditors & Good Faith Purchasers > Passing of Title*
[HN6] The Delaware Supreme Court has interpreted Del. Code Ann. tit. 10, § 3104(c)(1), as a specific jurisdiction provision that requires a nexus between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. In order to meet the requirements of § 3104(c)(1), the defendant's actions must be directed at residents of Delaware and the protection of Delaware laws. However, when a manufacturer passes title to goods to a third party outside of Delaware, it has not performed an act in Delaware.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Jurisdiction*
*Torts > Procedure > Commencement & Prosecution > Personal Jurisdiction*
[HN7] Under Del. Code Ann. tit. 10, § 3104(c)(4), the court may exercise personal jurisdiction over anyone who

causes tortious injury in the state or outside of the state by an act or omission outside the state if the person regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from services, or things used or consumed in the state.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN8] Delaware courts have interpreted Del. Code Ann. tit. 10, § 3104(c)(4), as a general jurisdiction provision. This general jurisdiction provision allows the court to exercise jurisdiction when the defendant's contacts with the forum state are unrelated to the cause of action.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
[HN9] A tortious act under Del. Code Ann. tit. 10, § 3104(c)(4), is an act which involves a breach of duty to another and makes the one committing the act liable in damages.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN10] Delaware courts have broadly construed the term "substantial revenue" to mean that two to three percent of total revenue is sufficient to confer jurisdiction. However, when a defendant's sales to customers in Delaware constitute less than one percent of total revenue, it is not substantial enough to warrant an exercise of jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN11] The Due Process Clause requires that, in order to subject a defendant who is not present within the territory of the forum to personal jurisdiction, the court must first make sure that the party has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of justice and fair play. In order to give non-residents fair warning that a particular activity may subject them to litigation within the forum, these minimum contacts must be purposeful.

In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be haled before a court in the forum as a result of its conduct. Finally, even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits***
***Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection***
[HN12] The substantial connection between the defendant and the forum state necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum state. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum state, for example, designing the product for the market in the forum state, advertising in the forum state, establishing channels for providing regular advice to customers in the forum state, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.

**COUNSEL:** [*1]    For M&M TECHNOLOGIES INC, Plaintiff: George Pazuniak, Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For GURTLER CHEMICALS INC., Defendant: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE; Kevin W. Goldstein, Stradley Ronon Stevens & Young, LLP, Malvern, PA.

For GURTLER CHEMICALS INC., Counter–Claimant: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE.

For M&M TECHNOLOGIES INC, Counter–Defendant: George Pazuniak, Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For BURLINGTON CHEMICAL, Defendant:  Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE.

For  GURTLER  CHEMICALS  INC.,  Third–Party Plaintiff: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE; Kevin W. Goldstein, Stradley Ronon Stevens & Young, LLP, Malvern, PA.

For GURTLER CHEMICALS INC., Counter–Claimant: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & [*2] Prestia, Wilmington, DE; Kevin W. Goldstein, Stradley Ronon Stevens & Young, LLP, Malvern, PA.

For M&M TECHNOLOGIES INC, Counter–Defendant: George Pazuniak, Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

On October 30, 2003, the plaintiff, M&M Technologies, Inc. ("M&M"), filed this patent infringement action against Gurtler Chemicals, Inc. ("Gurtler"). Presently before the court is a motion to dismiss for lack of personal jurisdiction filed by third–party defendant Burlington Chemical Company, Inc. ("Burlington"). For the following reasons, the court will grant the motion.

**II. BACKGROUND**

The patent–in–suit, *U.S. Patent No. 6,159,548* (the "'548 patent"), allegedly is owned by M&M. The patented invention is a method for oilproofing and waterproofing previously manufactured fabric with an aerosol spray containing a diluted fluoroacrylate emulsion. The complaint alleges that Gurtler has infringed, induced infringement of, or contributorily infringed the method claims of the '548 patent.

On July 12, 2004, Gurtler filed a motion [*3] to file a second amended answer, counterclaim, and third–party complaint. The court granted Gurtler's motion on September 22, 2004. Gurtler named Burlington as a third–party defendant and brought claims against Burlington for negligent misrepresentation and violation of the *Uniform Commercial Code, Section 2–312, i.e.* breach of warranty. The third–party complaint alleges in Count I that: (1) Gurtler makes its allegedly infringing product merely

by adding water to Burcopel CAT, a product sold to it by Burlington; (2) at the time Burlington began selling Burcopel CAT to Gurtler, Burlington orally represented and warranted that Gurtler's use of the product would not infringe, induce infringement of, or contributorily infringe the *'548 patent*; and (3) Burlington breached its warranty against infringement. Count II alleges that: (1) Burlington's representation that Burcopel CAT was not infringing was a false representation of fact; (2) Burlington made the false representation because of its lack of reasonable care in ascertaining the facts; (3) Burlington made the false representation with an intention to induce Gurtler to act; (4) Gurtler justifiably relied on the false representation; [*4] and (5) Burlington's actions caused Gurtler to incur damages.

Burlington is a North Carolina corporation, with no place of business in Delaware. It neither owns nor leases any property in Delaware. Burlington is not registered with the Secretary of State to do business in Delaware. It maintains no office, local telephone listing, or bank accounts in Delaware, and similarly, has no employees in Delaware. It has not paid taxes or franchise fees in Delaware. Burlington has never commenced any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware, except in the current litigation.

Burlington entered into an agreement with Gurtler for the sale of Burcopel CAT, a chemical that adheres to fabric causing it to become water resistant. Pursuant to the terms of the Memorandum of Sale, the product was shipped collect to Gurtler in South Holland, Illinois. n1 After receiving the Burcopel CAT, Gurtler dilutes it with water, and distributes and sells the product to its United States and international customers under its "Pulse Shield" trademark.

> n1 Gurtler is an Illinois Corporation with an established place of business in Sought Holland, Illinois.

[*5]

Burlington does not sell Burcopel CAT to any customers in Delaware. Burlington's sales of products to Delaware customers in 2001, 2002, and 2003 were less than $1,000.00 each year, and comprised approximately 0.0007% of Burlington's annual sales revenues. In 2004, Burlington directly sold products to three customers in Delaware. Burlington had sales of $4,000.00 to one Delaware customer, $70.00 to a second Delaware customer, and $16,000.00 to a Delaware distributor. These sales comprised approximately 0.14% of Burlington's 2004 sales revenues.

## III. STANDARD OF REVIEW

Burlington moves to dismiss the third-party complaint for lack of personal jurisdiction over the defendant.[HN1] "*Rule 12(b)(2) of the Federal Rules of Civil Procedure* requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[]." *E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, 197 F.R.D. 112, 119 (D. Del. 2000)*. [HN2] In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute in the state in which the court sits. *Transportes Aeros de Angola v. Ronair, Inc., 544 F. Supp. 858, 864-65 (D. Del. 1982)*. [*6] If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the *Due Process Clause of the Fourteenth Amendment*. *Id.* (noting, however, "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elecs., 948 F. Supp. 338, 342 (D. Del. 1996)* (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)* (citation omitted). Specifically, Gurtler must show that Burlington "purposefully availed itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)); see also Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 108-09, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987)*. Unless the [*7] contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984)*.

[HN3] In determining the jurisdictional question, the court must accept as true the allegations in the complaint, *Altech Indus., Inc. v. Al Tech Specialty Steel Corp., 542 F. Supp. 53, 55 (D. Del. 1982)*, but Gurtler bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Burlington. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc., 147 F. Supp. 2d 268, 270-71 (D. Del. 2001)*. To meet this burden, Gurtler must adduce facts which 'establish with reasonable particularity' that jurisdiction over the movant exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc., 936 F. Supp. 177, 193 (D. Del. 1996)*).

## IV. DISCUSSION

### A. Delaware's Long–Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, *Del. Code Ann. tit. 10 § 3104*, warrant the exercise of jurisdiction over Burlington. Burlington contends that the **[*8]** court has no basis to assert jurisdiction, while Gurtler maintains that the conduct of Burlington satisfies the requirements of subsections *(c)(1)* and *(c)(4)* of the long-arm statute. The court will address each of these sections below.

#### 1. Delaware Long–Arm Statute § 3104(c)(1)

[HN4] Under *subsection (c)(1)*, the court may exercise jurisdiction over a nonresident who transacts any business or performs any character of work or service in the State. *DEL. CODE ANN. tit. 10 § 3104(c)(1)*. Gurtler asserts that Burlington has acted in consort with Gurtler to place Burcopel CAT into a nationwide distribution network and, as a result, Burcopel CAT may have found its way to Delaware. Thus, Burlington has availed itself of the benefits of the State of Delaware. The court disagrees.

[HN5] Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab, 724 A.2d 1150, 1156–57 (Del. Super. 1997).* [HN6] The Delaware Supreme Court has interpreted subsection *(c)(1)* as a specific jurisdiction provision that requires a "nexus" **[*9]** between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D&B, S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986).* In order to meet the requirements of subsection *(c)(1)*, Burlington's actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. v. Micron Technology, 821 F. Supp. 272, 274 (D. Del. 1993).* However, when a manufacturer passes title to goods to a third party outside of Delaware, it has not performed an act in Delaware. *Boone, 724 A.2d at 1156.* In the present case, Burlington did not pass title to Gurtler in Delaware. Rather, Burlington passed title to the Burcopel CAT in South Holland, Illinois. (*D.I. 52 P 4*). In addition, Burlington's sales of products in Delaware are unrelated to Gurtler's claims and, therefore, cannot give rise to specific jurisdiction. *See ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc., 147 F. Supp. 2d 268 (D. Del. 2001).*

Gurtler maintains that Burlington's actions were directed at Delaware because it engaged Gurtler as a nationwide distributor of **[*10]** Burcopel CAT. Gurtler further asserts that where a party contracts to have its product distributed by another throughout the United States, it contracts to have its product distributed to each state as an individual forum. *See Boone, 724 A.2d at 1160.* The court agrees that a party who contracts to have its product distributed throughout the United States is subject to jurisdiction in any state. There is no evidence in the record, however, that Gurtler was acting as Burlington's distributor of Burcopel CAT. Indeed, Gurtler purchased Burcopel CAT from Burlington, diluted it with water and sold it under Gurtler's "Pulse Shield" trademark. Moreover, the Burcopel CAT does not maintain a separate identity in Gurtler's product and Burlington is not identified to the end user. As such, subsection *(c)(1)* is not a basis for the exercise of jurisdiction over Burlington.

#### 2. Delaware Long–Arm Statute § 3104(c)(4)

Additionally, Gurtler asserts that Burlington has, within the meaning of subsection *(c)(4)*, availed itself of the general jurisdiction of Delaware. [HN7] Under subsection *(c)(4)*, the court may exercise personal jurisdiction over anyone who "causes tortious injury in the State **[*11]** or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. *DEL. CODE ANN. tit. 10 § 3104(c)(1)*. Gurtler contends that jurisdiction is proper under subsection *(c)(4)* because Burlington's actions with respect Burcopel CAT have caused tortious injury in Delaware, Burlington maintains significant contacts with the District of Delaware, and Burlington receives substantial revenue from the sale of Burcopel CAT to Gurtler.

[HN8] Delaware courts have interpreted *§ 3104(c)(4)* as a general jurisdiction provision. *See Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc., 295 F. Supp. 2d 400, 405 (D. Del. 2002); Boone, 724 A.2d at 1155* (citing *Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc., 685 A.2d 724, 727–28 (Del. Super. 1996)).* This general jurisdiction provision allows the court to exercise jurisdiction when the defendant's contacts with the forum state are unrelated to the cause of action. *Bell Helicopter, 295 F. Supp. 2d at 405.* **[*12]**

First, the court must determine if the alleged acts set forth in the third-party complaint constitute a tortious injury for the purposes of jurisdiction. [HN9] A tortious act under *§ 3104(c)(4)* is an act "which involves a breach of duty to another and makes the one committing the act liable in damages." *Magid v. Marcal Paper Mills, Inc., 517 F. Supp. 1125, 1130 (D. Del. 1981).* Applying Delaware law, the court finds that the alleged breach of warranty and negligent misrepresentation by Burlington each constitute a breach of duty owed to Gurtler.

Next, the court must determine if Burlington regularly does or solicits business in Delaware. The court concludes that Burlington does not regularly do business in Delaware. As previously discussed, Burlington is a North Carolina corporation, with no office or place of business in Delaware. (*D.I. 52 P 2*). Burlington has not appointed any agent for service of process in Delaware and is not registered to do business in Delaware. (*Id.*) It has no local telephone listing, bank accounts, real estate or employees in Delaware. (*Id.*) It has not paid any taxes or franchise fees in Delaware. (*Id.*). It has never commenced [*13] any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware, except for the current litigation. (*Id.*) The court also concludes that Burlington does not regularly solicit business or advertise in Delaware. Further, while Burlington does maintain an Internet website that it can use to solicit business from Delaware, the mere existence of its website does not rise to the level of regularly soliciting business in Delaware. *See Motorola Inc. v. PC-Tel, 58 F. Supp. 2d 349, 352 (D. Del. 1999)* (discussing extensive advertising by the defendant, both nationwide and in Delaware through newspapers, magazines, and catalogs). Thus, the court concludes that Burlington does not regularly do or solicit business in Delaware.

Lastly, the court must determine whether Burlington derives substantial revenue from services or things used or consumed in Delaware. [HN10] Delaware courts have broadly construed the term "substantial revenue" to mean that two to three percent of total revenue is sufficient to confer jurisdiction. *See United States v. Consolidated Rail Corp., 674 F. Supp. 138, 144 (D. Del. 1987)*. However, [*14] when a defendant's sales to customers in Delaware constitute less than one percent of total revenue, it is not substantial enough to warrant an exercise of jurisdiction. *Bell Helicopter, 295 F. Supp. 2d at 405*. In the present case, Burlington's sales of products to customers in Delaware in 2001, 2002, and 2003 were about $1,000.00 each year, representing 0.0007% of Burlington's annual sales revenues. (D.I. 53, at 2–3). In 2004, Burlington had sales to three customers in Delaware that totaled approximately $20,070.00. (*Id. at 3*). While Burlington's sales of products to Delaware customers grew in 2004, its Delaware revenue only comprised approximately 0.14% of its total annual sales. (*Id.*) Because Burlington's Delaware revenue was less than 1% of its total annual revenue, it is not substantial enough to warrant an exercise of general jurisdiction. The court, therefore, finds that even though the acts alleged in the third–party complaint, if proved, might constitute a breach of duty owed by Burlington, Gurtler has not made a *prima facie* showing of personal jurisdiction over Burlington under *§ 3104(c)(4)* of the Delaware long–arm statute.

**B. Due Process [*15]**

The second step in the court's analysis is to determine whether exercising jurisdiction comports with the requirements of the *Due Process Clause*. [HN11] The *Due Process Clause* requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.'" *See International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)*. In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*. In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)*. n2 Finally, "even if the requisite minimum contacts have been found through an application of the stream [*16] of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *See Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1568 (Fed. Cir. 1994)*.

n2 The United States Supreme Court has explained that:

[HN12] the "substantial connection" . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. . . . The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the

sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.

*ICT Pharms., 147 F. Supp. 2d at 272* (quoting *Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987))*.

[*17]

Gurtler first asserts that the court should exercise jurisdiction over Burlington because Burlington has purposeful minimum contacts with the State of Delaware of the quantity and type to cause it to reasonably foresee that it would be "haled before a court" located in Delaware. Jurisdiction is proper, according to Gurtler, because it informed Burlington that it diluted Burcopel CAT with water to produce Pulse Shield, which, in turn, it placed into a distribution chain that consisted of laundering facilities across the United States. (D.I. 56, at 4). Burlington, therefore, knew that its Burcopel CAT was shipped nationally as the sole compositional ingredient in Pulse Shield. (*Id.*) Thus, Burlington has minimum contacts to satisfy due process requirements by contracting for the sale of Burcopel CAT to Gurtler, thereby directing its product into the stream of commerce of the United States and Delaware. Gurtler further asserts that, at the time this litigation was brought, Gurtler and Burlington were involved in significant business negotiations involving Burcopel CAT, which included a proposal by Gurtler that Burlington dilute the Burcopel CAT, affix Gurtler's labeling, and ship [*18] it directly to Gurtler's clients. (*Id. at 5*). However, as Gurtler points out, a final contract was never entered. Gurtler contends that these negotiations put Burlington on notice that by providing Burcopel CAT to Gurtler, Burlington would be submitting to the jurisdiction of the districts to which the Gurtler product was shipped. Gurtler relies on *Boone* and *Motorola* to support its stream of commerce theory. Gurtler argues that, as in *Boone* and *Motorola,* the defendant seeking to be dismissed, *i.e.* Burlington, engaged a distributor, *i.e.* Gurtler, who shipped the defendant's product across the country. Thus, not only did Burlington anticipate the fact that its product would be distributed in all states including Delaware, it took affirmative steps to direct its product to Delaware by and through its agreement with Gurtler. (D.I. 56, at 5).

After reviewing the record, the court finds that Gurtler's reliance on *Boone* and *Motorola* is misplaced be-

cause both cases are distinguishable from the present case. First, there is no evidence in the record that Burlington engaged Gurtler to be its exclusive distributor of Burcopel CAT in the United States, which [*19] was a critical factor in *Boone.* The court in *Boone* found that the defendant had exhibited an intent to serve the Delaware market because it engaged a resident company as the exclusive distributor of its product in the United States and directly benefitted from the distribution. *Boone, 724 A.2d at 1160.* As previously discussed, Gurtler purchased Burcopel CAT from Burlington, diluted it with water and sold it as Pulse Shield. These actions are not consistent with a distributor/distributee relationship. In addition, the record shows that Burlington does not benefit directly from Burlington's "distribution." Gurtler asserts that Burlington has received approximately $66,770.00 for purchases of Burcopel CAT. However, Gurtler does not assert that the money was a direct benefit from its distribution of Pulse Shield. Rather, it was money that Burlington received from the sale of Burcopel CAT to Gurtler alone. This situation is distinguishable from *Boone,* where the defendant earned $270,000 from sales of its product by its distributor in Delaware. *See id. at 1158.*

Likewise, *Motorola* is distinguishable. First, the *Motorola* defendant's product [*20] was integrated into a variety of consumer products manufactured by well-known multi-national corporations. n3 The goods produced by the corporations were then placed for sale in well-known retail stores, including Caldor and Circuit City, which all had outlets in Delaware. Further, the products were advertised extensively, both nationwide and in Delaware through newspapers, magazines, and catalogs. *Motorola, 58 F. Supp. 2d at 352.* While Burcopel CAT is integrated into Gurtler's Pulse Shield, there is no evidence in the record that Gurtler places the Pulse Shield for sale in well-known retail stores with outlets in Delaware. The record is also devoid of evidence that Gurtler advertises the Pulse Shield, either nationwide or in Delaware.

> n3 The *Motorola* defendant's product was a softmodem that was integrated into Compaq, Phillips, Samsung, Sharp, and Sony consumer electronic products.

More important, the *Motorola* court found that the licensing fees and royalties from which the defendant [*21] derived its revenues "appeared to be based upon the sale to *end users* of products containing its softmodems." *Id.* Indeed, the court noted that the "End User distribution channel" of the defendant's licensing agreement "contemplated sale to retail consumers including consumers in Delaware of 'Shipped End User Product[s]' through retail outlets." *Id.* In the present case, Gurtler does not assert

that Burlington derives revenue based on the sale of the Pulse Shield to end users. Conversely, Gurtler asserts that Burlington derives revenue based on its sale of Burcopel CAT to Gurtler.

Another important distinction between *Motorola* and the present case is that the *Motorola* defendant maintained an interactive website from which end users could download modem control commands to their computers to enable them to perform certain functions with the defendant's softmodems. In addition, the customers could order products to test their softmodems and obtain customer support directly from the defendant by telephone and Internet. The record also indicated that Delaware customers had utilized the features of the defendant's support network. *Id.* In the present case, Burlington **[*22]** does not offer the same type of customer support network. According to Gurtler, Burlington maintains an Internet website that allows potential clients in Delaware to access certain advertisements. The website also provides a toll free phone number for client communication and order solicitation. Burlington's website offerings are not nearly as extensive as those offered by the defendant in *Motorola.* Moreover, Gurtler has not asserted that end users of its Pulse Shield can obtain customer support from Burlington's website or toll free number.

Finally, Gurtler asserts that Burlington has admitted that it transacts certain business in Delaware and, therefore, has not only availed itself to Delaware by implicitly soliciting business in the state, but also it has derived substantial revenue from Delaware. The court disagrees. As previously discussed, Burlington's Delaware revenue for the years 2001 through 2004 was less than 1% of its total annual revenue for each year and, therefore, not substantial enough to warrant an exercise of jurisdiction. Thus, Burlington does not have sufficient contacts with this forum to compel its appearance here without offending the *Due Process Clause.* **[*23]** n4

> n4 The court need not address whether jurisdiction in Delaware comports with the "minimum requirements inherent in the concept of 'fair play and substantial justice'" because Burlington's contacts with Delaware are insufficient to cause it to reasonably foresee being haled before a Delaware court.

Dated: February 8, 2005

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. Burlington Chemical Company's Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 51) is GRANTED.

Dated: February 8, 2005

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE